**EM LTD., Plaintiff–Appellant,**

**v.**

**REPUBLIC OF ARGENTINA, Defendant–Appellee.**

**NML Capital, Ltd., Plaintiff–Appellant,**

**v.**

**The Republic of Argentina, Defendant–Appellee.**

**NML Capital, Ltd., Plaintiff–Appellant,**

**v.**

**The Republic of Argentina, Defendant–Appellee,**

**Banco Central De La Republica Argentina, Interested–Non–Party–Appellee.**

**Docket Nos. 06–0403–cv, 06–0405–cv, 06–0406–cv.**

United States Court of Appeals, Second Circuit.

Argued: Aug. 29, 2006.

Decided: Jan. 5, 2007.

David W. Rivkin (Dennis H. Hranitzky, Jason R. Abel, on the brief), Debevoise & Plimpton LLP, New York, NY, for Plaintiff–Appellant EM Ltd.

Roy T. Englert, Jr., Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, DC (Alan E. Untereiner, Robbins, Russell, Englert, Orseck & Untereiner LLP, Washington, DC; Robert A. Cohen, Dechert LLP, New York, NY, on the brief), for Plaintiff–Appellant NML Capital, Ltd.

Jonathan I. Blackman (Carmine D. Boccuzzi, Michael J. Byars, on the brief), Cleary Gottlieb Steen & Hamilton LLP, New York, NY, for Defendant–Appellee The Republic of Argentina.

Joseph E. Neuhaus (Laurent S. Wiesel, Claire E. Coleman, Julia M. Guaragna, Sergio J. Galvis, on the brief), Sullivan & Cromwell LLP, New York, NY, for Interested–Non–Party–Appellee Banco Central de la República Argentina.

Serrin Turner, Assistant United States Attorney (Michael J. Garcia, United States Attorney, Kathy S. Marks, Assistant United States Attorney, United States Attorney's Office for the Southern District of New York, New York, NY; Peter Keisler, Assistant Attorney General, Douglas N. Letter, Irene Solet, Department of Justice, Washington, D.C.; Arnold I. Havens, General Counsel, Department of Treasury, Washington, D.C.; John B. Bellinger, III, Legal Adviser, Department of State, Washington, D.C., on the brief), United States Attorney's Office for the Southern District of New York, New York, NY, for Amicus Curiae United States of America in support of Appellees.

Barry M. Schindler (Thomas C. Baxter, Jr., General Counsel, James P. Bergin, Andrew C. Huszar, on the brief), Federal Reserve Bank of New York, New York, NY, for Amicus Curiae Federal Reserve Bank of New York in support of Appellees.

Before WINTER, CABRANES, and POOLER, Circuit Judges.

JOSÉ A. CABRANES, Circuit Judge.

This appeal arises from the efforts of plaintiffs-appellants NML Capital, Ltd. ("NML") and EM Ltd. ("EM") (collectively, "plaintiffs") to attach certain funds held in an account of the Banco Central de la República Argentina ("BCRA"), the central banking authority of the Republic of Argentina ("Argentina" or "the Republic"), at the Federal Reserve Bank of New York ("FRBNY") (the "FRBNY Account").[1] EM holds, and NML seeks, a judgment against the Republic arising out of the Republic's default on debt obligations held by EM and NML. Even though plaintiffs do not hold or seek judgments against BCRA, they contend that they are entitled to attach $105 million of BCRA's funds held in the FRBNY Account (the "FRBNY Funds"). In particular, plaintiffs argue that the Republic obtained an attachable interest in the FRBNY Funds after the President of the Republic issued two decrees that gave the Republic the authority to use BCRA funds for repayment of the Republic's debts to the International Monetary Fund ("IMF"), but that did not specifically designate the FRBNY Funds for use in repaying the IMF. The United States District Court for the Southern District of New York (Thomas P. Griesa, *Judge* ) vacated orders of prejudgment attachment obtained by NML, and postjudgment restraining notices obtained by EM, that had previously been ordered with respect to the FRBNY Funds. This appeal followed.

We consider here whether the Republic's actions associated with the repayment of its debt to the IMF deprived the FRBNY Funds of immunity from attachment under provisions of the Foreign Sovereign Immunities Act of 1976 ("FSIA") related to the attachment of sovereign assets, 28 U.S.C. §§ 1609–11. We affirm the order of the District Court, concluding that the FRBNY Funds are immune from attachment under the FSIA because, notwithstanding the issuance of the decrees, the FRBNY Funds continue to be owned by BCRA, a separate juridical entity from

---

1. Plaintiffs also sought to attach accounts held by BCRA in other New York banks, but the FRBNY Account was the only one in which there were any substantial assets. Our conclusions in this opinion concerning the FRBNY Account also apply to all other accounts that were attached by plaintiffs.

the Republic, and are not available to satisfy a judgment against the Republic. Moreover, we conclude that the provisions of the FSIA allowing attachment of a foreign state's "property in the United States ... used for a commercial activity in the United States," 28 U.S.C. § 1610(a); *see also id.* § 1610(d) (allowing prejudgment attachment of a foreign state's property "used for a commercial activity in the United States"), would not permit attachment of the FRBNY Funds even if the funds were considered an attachable asset of the Republic. A government's repayment of its debt to the IMF is not a "commercial activity," and the record is barren of any evidence that the FRBNY Funds were to be "used for" repayment of the IMF.

## BACKGROUND

### I. Facts and Procedural History

In December 2001, in the midst of a financial crisis in Argentina, the Republic announced a moratorium on its debt service payments. Since that time, the Republic has not made scheduled payments on the debt instruments at issue in this litigation.[2]

---

2. We note that Argentina has made many contributions to the law of foreign insolvency through its numerous defaults on its sovereign obligations, as well as through what we might term a diplomacy of default.

Argentina's history of defaulting on, or requiring restructuring of, its sovereign obligations has produced a rich literature. After selling bonds on the London stock exchange in the early part of the 1820s, Argentina defaulted on its debt in 1827 (at roughly the same time that other Latin American nations defaulted on their foreign debt), and did not reach a settlement with creditors on the debt until 1857. *See* Carlos Marichal, *A Century of Debt Crises in Latin America* 14, 34–35, 55–60, 59 t.2 (1989). Argentina again defaulted on its debts in 1890, causing a financial panic in England as Argentina's primary creditor, the London merchant bank Baring Brothers, experienced a liquidity crisis upon Argentina's default. *See id.* at 149–59. In 1956, Argentina's threatened default led to the creation of the Club of Paris, an international organization established "for the purpose of settling controversies concerning debts that were guaranteed or owed by LDC [Less Developed Country] governments to creditor governments." Mashaalah Rahnama–Moghadam, David A. Dilts, & Hedayeh Samavati, *The Clubs of London & Paris*, Disp. Resol. J., Nov. 1998, at 71, 72; *see also* Paris Club, *Description of the Paris Club*, http://www.clubdeparis.org/en/presentation/presentation.php?BATCH=B01WP01 (last visited Nov. 29, 2006) (describing first meeting of Paris Club in 1956 among Argentina and creditor nations). In 1982, Argentina, along with other Latin American nations, experienced a financial crisis that led it to suspend interest payments on foreign debt and to engage in difficult negotiations with foreign and multilateral lenders. *See* Ernest J. Oliveri, *Latin American Debt and the Politics of International Finance* 163–203 (1992); *see also Republic of Argentina v. Weltover*, 504 U.S. 607, 609–10, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992) (discussing Argentina's failure to meet foreign exchange insurance obligations in 1982 and foreign debt obligations in 1986). According to one commentator, as the Argentinian debt crisis developed between 1983 and 1985, "Argentina emerged as the single most resistant debtor in international finance." Oliveri, *ante*, at 164. Then, in December 2001, Argentina announced that it would impose a moratorium on public sector debt payments—causing the largest default of a foreign state in history. *See, e.g.*, Arturo C. Porzecanski, *From Rogue Creditors to Rogue Debtors: Implications of Argentina's Default*, 6 Chi. J. Int'l L. 311, 317 (2005) (describing Argentina's most recent default as "by far the largest and potentially most complex default the world has ever known"); *see also Eternity Global Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 175 (2d Cir.2004) (discussing events leading up to 2001 "debt moratorium").

In light of this history, it is perhaps unsurprising that Argentina's scholars and diplomats have contributed to development of innovative theories of international law in response to the world community's efforts to collect on defaulted sovereign obligations. The nineteenth century Argentine jurist Carlos Calvo propounded a theory (later called

On April 10, 2003, EM, a holder of defaulted Argentine debt, filed an action against the Republic in the United States District Court for the Southern District of New York to recover more than $700 million in interest and principal owed on an Argentine bond it had acquired. EM moved for summary judgment, and the Court granted the motion on September 12, 2003, awarding final judgment to EM in the amount of $724,801,662.56. *See EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507(TPG), 2003 WL 22120745 (S.D.N.Y. Sept.12, 2003), *amended by EM Ltd. v. Republic of Argentina*, No. 03 Civ. 2507(TPG), 2003 WL 22454934 (S.D.N.Y. Oct.27, 2003).[3] We affirmed the judgment in favor of EM on August 31, 2004. *See EM Ltd. v. Republic of Argentina*, 382 F.3d 291, 292–94 (2d Cir.2004).

the "Calvo Doctrine") that "absolutely condemn[ed] diplomatic as well as armed intervention as legitimate methods of enforcing any or all private claims of a purely pecuniary nature, at least such as are based upon contract or are the result of civil war, insurrection, or mob violence." Amos S. Hershey, *The Calvo and Drago Doctrines*, 1 Am. J. Int'l L. 26, 26–27 (1907); *see also Banco Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 888 n. 19 (2d Cir.1981) ("[T]he Calvo doctrine, based on the writings of the nineteenth century Argentine jurist Carlos Calvo, holds that a state need compensate aliens only to the extent that it would compensate its own nationals. If under a state's laws its nationals are entitled to no compensation for expropriated property, an alien likewise would have no right to compensation." (citing G. Hackworth, *Digest of Int'l Law* § 530 (1943))). The Calvo Doctrine stands in contrast to principles of customary international law establishing an international standard for claims of injury to aliens. These principles are derived from Emmeric de Vattel's assertion that an injury to an alien living in a foreign State constitutes an injury to the alien's state of nationality. *See* E. de Vattel, *The Law of Nations or the Principles of Natural Law* 136 (C. Fenwick trans., Legal Classics Library special ed. *1993*) (1758) ("Whoever ill-treats a citizen indirectly injures the State, which must protect that citizen."). From Vattel's famous doctrine flows the "international minimum standard," which, in contrast to the Calvo Doctrine, "takes into account the possibility that the standards prevailing in a given State may be so low that, even if nationals and aliens are treated (or oppressed) alike, the norms of international law [concerning the protection of aliens] will have been violated." Richard B. Lillich, *The Human Rights of Aliens in Contemporary International Law* 17 (1984); *see also* Frank Griffith Dawson & Ivan L. Head, *International Law National Tribunals and the Rights of Aliens* 10 (1971) (describing the "International Minimum Standard of Justice" as "the standard of substantive and procedural treatment which aliens purportedly should receive in 'civilized' States and which they thus should receive abroad under international law"). Under this principle, aliens may be entitled under customary international law to compensation for expropriation of property rights (*e.g.*, through the state's default on its debt obligations) even where nationals of the expropriating state are not. *See* Louis B. Sohn & R.R. Baxter, *Responsibility of States for Injuries to the Economic Interests of Aliens*, 55 Am. J. Int'l L. 545, 557 (1961) ("[T]he provision of compensation to aliens whose property is taken is consistent with that special protection which is given to aliens, even in cases where such protection may place aliens in a privileged position vis-à-vis the nationals of the State concerned.").

In 1902, Argentina's Minister of Foreign Affairs, Luis M. Drago, developed a narrower proposition (later called the "Drago Doctrine") that "the public debt [of an American state] can not occasion armed intervention, nor even the actual occupation of the territory of American nations by a European power." Hershey, *ante*, at 30 (quoting Letter from Luis M. Drago, Argentine Minister of Foreign Affairs, to Sr. Merou, Argentine Minister at Washington (Dec. 29, 1902)); *see also, e.g.*, Dawson & Head, *ante*, at 12–13 (discussing subsequent history of Drago Doctrine).

3. As of December 30, 2005, almost $21 million in postjudgment interest had accrued, bringing the total value of the judgment as of that date to $745,544,496.12.

NML, another holder of defaulted Argentine debt, filed suit in the United States District Court for the Southern District of New York on November 7, 2003, seeking to recover funds due on approximately $170 million in defaulted bonds that the Republic had issued. NML filed a second action on February 28, 2005, seeking payment on approximately $32 million in so-called "Argentine Floating Rate Accrual Notes." No judgment had been rendered in either of NML's suits at the time NML sought to attach the FRBNY Funds.

In the terms and conditions governing EM's bond, the Republic "irrevocably agreed not to claim and has irrevocably waived ... immunity to the fullest extent permitted by the laws of [the] jurisdiction." Terms and Conditions Governing Bond Issued June 22, 2001, Joint Appendix ("J.A.") 54. The Republic also "consent[ed] generally for the purposes of the Foreign Sovereign Immunities Act to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment, provided that attachment prior to judgment or attachment in aid of execution shall not be ordered by the Republic's courts with respect to ... the assets which constitute freely available reserves." *Id.* The bonds that NML acquired contained similar waivers.

On December 15, 2005, Argentina's President, Néstor Kirchner, issued two emergency executive decrees: Decree 1599/2005 and Decree 1601/2005 (the "Decrees"). Decree 1599 provided that BCRA reserves in excess of the amount needed for the backing of the Republic's "monetary base," *see* Law No. 23,928 of 3/27/91 art. 6, *as amended by* Law No. 25,561 of 1/7/02 art. 4, J.A. 447 (defining "monetary base" as "composed of the monetary circulation [of Argentine pesos] plus the demand deposits of the financial entities with [BCRA], in checking accounts or special accounts"), "may be used for payment of obligations undertaken with international monetary authorities." Decree 1599/2005 art. 1, J.A. 22. These excess reserves were dubbed "unrestricted reserves" by the decree ("Unrestricted Reserves").[4] Decree 1601/2005 directed the Ministry of Economy and Production (the "Ministry") to take the necessary steps to repay the Republic's debt to the IMF out of the Unrestricted Reserves. At the time of the Decrees, BCRA had approximately $26.8 billion in reserves and needed $18.4 billion to cover the monetary base; thus, approximately $8.4 billion in reserves became Unrestricted Reserves pursuant to the Decrees. On December 29, 2005, the Ministry issued Resolution No. 49, directing BCRA to repay the Republic's debt to the IMF and providing that, in exchange, the Republic would give BCRA a non-transferrable note. *See* Resolution No. 49 art. 1, J.A. 511 ("Let [BCRA] be instructed in line with [the Decrees] ... to repay the debt incurred with the [IMF].").

On December 30, 2005, EM moved in the District Court for an *ex parte* order in aid of enforcing its judgment, and Judge Barbara S. Jones, sitting in Part I, *see* Rules for the Division of Business Among District Judges of the Southern District of New York 5(b) (motions for "emergency matters in civil cases" presented to the district judge sitting in "Part I"), entered restraining notices, *see* 28 U.S.C. § 1610(c)

---

**4.** "Unrestricted Reserves" under the Decrees are to be distinguished from the "freely available reserves" referenced in the terms and conditions of the bonds. While the term "freely available reserves" referred to reserves held in support of the monetary base, the term "Unrestricted Reserves" as used in the Decrees refers to reserves *not necessary* for support of the monetary base.

(requiring that a court order the attachment of, or execution against, the assets of a foreign state or its instrumentalities); *see also* Fed.R.Civ.P. 69(a) ("The procedure on execution ... shall be in accordance with the practice and procedure of the state in which the district court is held ... except that any statute of the United States governs to the extent it is applicable"); N.Y. C.P.L.R. § 5222 (establishing procedure for service of restraining notices on parties holding property of judgment debtor), with respect to property of the Republic and the BCRA held at eight garnishee banking institutions, including the FRBNY. NML contemporaneously sought and obtained from Judge Jones *ex parte* orders of prejudgment attachment and temporary restraining orders concerning the same assets, *see* Fed.R.Civ.P. 64 (providing that remedies involving "seizure of ... property for the purpose of securing satisfaction of [a] judgment ... are available under the circumstances and in the manner provided by the law of the state in which the district court is held"); N.Y. C.P.L.R. § 6201 (setting forth grounds for prejudgment attachment under New York law).

On January 3, 2006, the Republic's debt to the IMF was repaid by BCRA using BCRA's assets. The FRBNY Funds were not used in connection with that payment, although the parties dispute whether the funds might have been used for this purpose in the absence of the court-ordered restraints on the transfer of the funds.

On January 6, 2006, the Republic and BCRA moved by order to show cause to vacate the attachments and restraining notices (collectively, the "Restraining Notices"). Following a conference held that day before Judge Griesa, to whom EM's and NML's suits against the Republic had been assigned, the parties agreed to modify the Restraining Notices pending resolution of the order to show cause, and on January 9, 2006, the District Court entered a stipulation and consent order that amended the Restraining Notices so that BCRA could conduct its day-to-day operations. Pursuant to these amended attachments and restraining notices (collectively, the "Amended Restraining Notices"), the garnishee institutions were required to maintain in any covered account a sum not less than 95% of the amount on deposit at the close of business on January 6, 2006. Of the putative garnishee institutions, only the FRBNY held any significant amount— namely, $105 million—that was subject to the Amended Restraining Notices. EM and NML cross-moved on January 10, 2006 to confirm the Amended Restraining Notices, and, in the alternative, EM sought discovery on five issues relating to the validity of the Amended Restraining Notices.[5]

---

**5.** EM claims to have sought discovery on the following issues:

(1) the effect of the Decrees under Argentine law; (2) the purposes of the funds subject to the Amended Restraining Notices; (3) how and from where Argentina paid the International Monetary Fund ("IMF") on January 3, 2006; (4) how the Central Bank's actions in implementing the Decrees compare to the "traditional" central banking activities of central banks; and (5) what Argentina plans to do with the foreign exchange reserves subject to the Decrees that will accumulate in the future.

Br. of Appellant EM 7. EM has not, however, cited to any part of the record demonstrating that these specific requests were made to the District Court. When disputing EM's contention that it was improperly denied discovery, the Republic refers to discovery requests made in EM's Memorandum in Support of Plaintiffs' Motion to Confirm, which was apparently filed with the District Court, but which was not included among the materials in the Joint Appendix submitted to this Court. Accordingly, no documents presented to this Court indicate that the requests listed above were made to the District Court. Neverthe-

## II. The District Court's Decision

Following submissions by the parties and oral argument, the District Court vacated the Amended Restraining Notices by oral decision on January 12, 2006. The District Court described four separate grounds for its decision. First, operating under the premise that assets owned by BCRA could not be used to satisfy judgments against the Republic, it rejected plaintiffs' argument that the Decrees had the effect of transferring ownership of the Unrestricted Reserves in general, or the FRBNY Funds in particular, from BCRA to the Republic. Plaintiffs had conceded at oral argument on the parties' cross-motions that the Unrestricted Reserves were the property of BCRA, not the Republic, before the issuance of the Decrees. The District Court concluded that the Decrees had no effect on the ownership of the Unrestricted Reserves, and certainly no effect on the ownership of the FRBNY Funds; thus, the Unrestricted Reserves and the FRBNY Funds remained the property of BCRA. The District Court agreed that the Decrees reflected the Republic's power to direct BCRA to take certain actions with respect to BCRA's assets, but, according to the District Court, the Republic's ability to exercise some control over BCRA did not mean that the ownership of the FRBNY Funds changed hands from BCRA to the Republic.

Second, the District Court held that even if it were to treat the FRBNY Funds as if they were owned by the Republic, plaintiffs would not be able to attach the funds under the FSIA unless they were able to demonstrate that the funds had become property of the Republic "used for a commercial activity in the United States," 28 U.S.C. § 1610(a)(1) (permitting postjudgment attachment of a foreign state's property "used for a commercial activity in the United States" if the foreign state had waived immunity from attachment); *id.* § 1610(d)(1) (same as to prejudgment attachment).[6] The District

---

less, we assume *arguendo* that, as represented by EM, these requests were made.

**6.** 28 U.S.C. § 1610 provides, in pertinent part, as follows:

(a) The property in the United States of a foreign state . . ., used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State . . . if—

(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver. . . .

. . . .

(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment

entered by a court of the United States or of a State after the effective date of this Act, if—

(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver. . . .

. . . .

(d) The property of a foreign state . . ., used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if—

(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or

Court concluded that plaintiffs did not satisfy this requirement here because the Republic's payments to the IMF, which were facilitated by the Decrees, constituted a "government financial activity and not a commercial activity."

Third, the District Court concluded that another provision of the FSIA, 28 U.S.C. § 1611(b)(1), provided a separate and independent basis for vacating the attachments and restraining orders. That statutory provision protects from attachment property "of a foreign central bank . . . held for its own account," unless the protection has been explicitly waived by the central bank or the bank's parent foreign government.[7] In the view of the District Court, the FRBNY Account "was, is, and continues to be the property of the central bank used for central banking functions," and therefore, "the prohibition of Section 1611 on attaching those funds must apply."

Fourth, the District Court rejected plaintiffs' arguments that there had been an explicit waiver of *BCRA's* immunity of the type that would be necessary to expose BCRA's assets to attachment under 28 U.S.C. § 1611(b)(1). The District Court also implicitly denied EM's discovery request by vacating the Amended Restraining Notices without authorizing further discovery.

On January 24, 2006, the District Court entered a written order formally vacating the Amended Restraining Notices, staying the order pending appeal, and certifying the order for appeal pursuant to 28 U.S.C. § 1292(b).[8]

We expedited the appeal. The United States and the FRBNY have appeared before us as *amici* in support of the Republic and BCRA.

## DISCUSSION

### I. Appellate Jurisdiction

We have jurisdiction pursuant to 28 U.S.C. § 1292(b). The appeal was certified by the District Court, and we agree that the District Court's ruling involves unresolved controlling questions of law, and that an appeal would advance the termination of the litigation.[9]

may ultimately be entered against the foreign state, and not to obtain jurisdiction.

7. 28 U.S.C. § 1611(b)(1) provides, in pertinent part:
Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if—
(1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver. . . .

8. 28 U.S.C. § 1292(b) provides, in pertinent part:
When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order. . . .

9. Consequently, we formally grant plaintiffs' motion to hear the appeal pursuant to 28 U.S.C. § 1292(b). Having accepted jurisdiction under § 1292(b), we need not consider whether jurisdiction would also be proper under 28 U.S.C. § 1292(a)(1), which grants appellate courts jurisdiction over orders "refusing or dissolving injunctions," or under the collateral order doctrine. *See Karaha Bodas*

## II. Standard of Review

■ We review a district court's ruling on a request for an order of attachment for abuse of discretion. *See Capital Ventures Int'l v. Republic of Argentina,* 443 F.3d 214, 222 (2d Cir.2006) (addressing prejudgment attachment). We will find such an abuse of discretion if the district court "applies legal standards incorrectly or relies upon clearly erroneous findings of fact, or proceed[s] on the basis of an erroneous view of the applicable law." *Id.* (quoting *Register.com, Inc. v. Verio, Inc.,* 356 F.3d 393, 398 (2d Cir.2004)); *see also Zervos v. Verizon N.Y., Inc.,* 252 F.3d 163, 169 (2d Cir.2001) ("error of law" constitutes "abuse of discretion").

In this case, we consider the legal conclusions that underlay the District Court's exercise of discretion to vacate the attachments—namely, that the Republic had no attachable interest in the FRBNY Funds, and that the funds were otherwise immune from attachment under the FSIA. Thus, the dispositive issues here are ones of law, which we review *de novo. See Heerwagen v. Clear Channel Commc'ns,* 435 F.3d 219, 225 (2d Cir.2006) (noting that this Court "will find an abuse of discretion whenever the district court commits an error of law, which we review *de novo*").

## III. Analysis

We agree with the decision of the District Court. We conclude that the Decrees did not create an attachable interest on the part of the Republic in the FRBNY Funds, and that Section 1610's provisions allowing attachment of property of a foreign state "used for a commercial activity" would not permit attachment of the FRBNY Funds

*Co., L.L.C. v. Perusahaan Pertambangan Minyak Dan Gas Bumi Negara,* 313 F.3d 70, 81 & n. 11 (2d Cir.2002) (considering appeal of orders related to attachment of assets of Indo-

even if they were attachable assets of the Republic.

### A. General Principles

The FSIA protects foreign states' property from attachment and execution, subject to existing international obligations, except under the conditions set forth in two other provisions of the FSIA, 28 U.S.C. §§ 1610 and 1611. *See* 28 U.S.C. § 1609 ("Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter."); *Letelier v. Republic of Chile,* 748 F.2d 790, 793 (2d Cir.1984) ("[U]nder [FSIA] § 1609 foreign states are immune from execution upon judgments obtained against them, unless an exception set forth in §§ 1610 or 1611 of the FSIA applies.").

■ The FSIA's protections against attachment and execution extend to the instrumentalities of a foreign state such as BCRA, although the protections applicable to assets of instrumentalities vary from those applicable to the assets of the foreign states themselves. *See Karaha Bodas,* 313 F.3d at 82 ("Section 1610 provides different regimes for sovereign states on the one hand, and their agencies and instrumentalities on the other."); *see also S & S Machinery Co. v. Masinexportimport,* 706 F.2d 411, 414 (2d Cir.1983) ("State-owned central banks indisputably are included in the [FSIA's] definition of 'agency or instrumentality.'"). Under subsections 1610(a) and (d), assets of a foreign state can be attached only *if the assets sought to be attached* are "used for a commercial

nesian national government and instrumentality under § 1292(b) without determining whether jurisdiction would also be proper under collateral order doctrine).

activity in the United States." But under subsection 1610(b), which concerns agencies and instrumentalities of foreign states, creditors may attach *"any property in the United States* of an agency or instrumentality of a foreign state engaged in commercial activity in the United States," 28 U.S.C. § 1610(b) (emphasis added). As we explained in *Karaha Bodas,* "[s]ubsection (a) is generally thought to be narrower than subsection (b). While subsection (b) applies to *all* property of the agencies and instrumentalities of foreign states, subsection (a) applies only to the property of foreign states that is 'used in commercial activity.'" *Karaha Bodas,* 313 F.3d at 82 (quoting *Conn. Bank of Commerce v. Republic of Congo,* 309 F.3d 240, 253 (5th Cir.2002)).

The FSIA provides additional protection to assets of foreign central banks. *See* 28 U.S.C. § 1611(b)(1), note 7, *ante.* Congress developed 28 U.S.C. § 1611(b)(1) to shield from attachment the U.S. assets of foreign central banks, many of which might be engaged in commercial activity in the United States while managing reserves and engaging in financial transactions, and to provide an incentive for foreign central banks to maintain their reserves in the United States:

> Section 1611(b)(1) provides for the immunity of central bank funds from attachment or execution. It applies to funds of a foreign central bank or monetary authority which are deposited in the United States and "held" for the bank's or authority's "own account"— i.e., funds used or held in connection with central banking activities, as distinguished from funds used solely to finance the commercial transactions of other entities or of foreign states. If execution could be levied on such funds without an explicit waiver, deposit of foreign funds in the United States might be discouraged. Moreover, execution against the reserves of foreign states could cause significant foreign relations problems.

H.R.Rep. No. 94–1487 ("FSIA House Report") at 31, *as reprinted in* 1976 U.S.C.C.A.N. 6604, 6630; *see also* Paul L. Lee, *Central Banks and Sovereign Immunity,* 41 Colum. J. Transnat'l L. 327, 376 (2003) (noting that Section 1611(b)(1) appears to have been developed in order to avoid the "potential difficulties" that central banks would be faced with if their assets were subject to attachment under the provisions of Section 1610(b) applicable to other instrumentalities).

Plaintiffs' reliance on the attachment provisions applicable to foreign states— § 1610(a) and its prejudgment counterpart, § 1610(d)—rather than on the attachment provisions applicable to foreign agencies and instrumentalities set forth in § 1610(b), makes clear that their arguments are premised on a threshold determination that the FRBNY Funds are an attachable interest of *the Republic,* not of BCRA.

**B. The Decrees Did Not Convert the FRBNY Funds Into an Attachable Interest of the Republic**

■ Although plaintiffs hold or seek judgments against the Republic, the FRBNY Funds that plaintiffs seek to attach are held in BCRA's name. Plaintiffs have conceded that: (1) before December 15, 2005, the date on which the Decrees were issued, the FRBNY Funds were the property of BCRA; (2) plaintiffs had no right to attach the FRBNY Funds before that date; and (3) even after issuance of the Decrees, the FRBNY Funds were held in BCRA's name. Thus, under New York law, it is presumed that the FRBNY Funds continue to be owned by BCRA

even after issuance of the Decrees.[10] *See Karaha Bodas*, 313 F.3d at 86 ("Under New York law, the party who possesses property is presumed to be the party who owns it. When a party holds funds in a bank account, possession is established, and the presumption of ownership follows." (citing *Pollock v. Rapid Indus. Plastics Co.*, 113 A.D.2d 520, 497 N.Y.S.2d 45, 49 (2d Dep't 1985); *Kolodziejczyk v. Wing*, 261 A.D.2d 927, 689 N.Y.S.2d 825, 825 (4th Dep't 1999); and *Perkins v. Guar. Trust Co. of N.Y.*, 274 N.Y. 250, 261, 8 N.E.2d 849 (1937))).

■ Plaintiffs do not bring to our attention any contrary New York or Argentine legal principles governing ownership of funds in bank accounts, *see Karaha Bodas*, 313 F.3d at 85–86 (analyzing New York and Indonesian legal principles governing rights of Indonesian government and Indonesian instrumentality to funds held in New York bank accounts), nor do they point to any order or other document explicitly transferring ownership of the FRBNY Funds from BCRA to the Republic. Instead, plaintiffs contend that the Decrees changed the legal status of $8.4 billion of BCRA's reserves—*i.e.*, the funds that the Decrees designated as Unrestricted Reserves—when it made those funds available to pay the Republic's debt to the IMF. NML contends that the Decrees had the effect of making the Unrestricted Reserves property of the Republic. *See* Br. of Appellant NML 32–33. EM argues that it is immaterial whether the "nominal" holding and ownership of the Unrestricted Reserves changed, because under New York attachment law the Unrestricted Reserves are attachable if the Republic has a right to assign or transfer them. *See* Br. of Appellant EM 27–29 (citing N.Y. C.P.L.R. § 5201(b) ("A money judgment may be enforced against any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested. . . .")). According to EM, the Unrestricted Reserves must be subject to attachment because the Decrees demonstrated the Republic's power to assign or transfer BCRA's assets. *See id.* at 27–28 ("Indeed, the fact that it was even *possible* for President Kirchner, with the stroke of a pen, to appropriate (or borrow) the Unrestricted Reserves to pay Argentina's debts and then direct when and how the payment should be made proves beyond question that the Argentine state controls not only the Unrestricted Reserves, but *all* of the Central Bank's assets.").

Plaintiffs also argue that the Decrees transformed all reserves of BCRA, including the FRBNY Funds, into attachable assets of the Republic because the Decrees did not specify *which* of BCRA's funds would be designated as Unrestricted Reserves and used to repay the IMF. *See* Br. of Appellant EM 31 ("The consequence of Argentina's deliberate decision to preserve all of its options with respect to paying its creditors out of its foreign exchange reserves, wherever located, is that all of the funds garnished by the Restraining Notices [including the FRBNY Funds] were Unrestricted Reserves."); Br. of Appellant NML 36 (arguing that the Decrees sub-

---

**10.** Under the FSIA and the Federal Rules of Civil Procedure, New York law governs the circumstances and manner of attachment and execution proceedings. *See Karaha Bodas*, 313 F.3d at 83 ("The FSIA states that when a foreign state is not protected by sovereign immunity, 'the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances.' 28 U.S.C. § 1606. In attachment actions involving foreign states, federal courts thus apply Fed.R.Civ.P. 69(a), which requires the application of local state procedures."); *Capital Ventures Int'l v. Republic of Argentina*, 443 F.3d 214, 218–19 (2d Cir.2006).

jected to attachment "any portion of the reserves held by the Central Bank anywhere in the world . . . unless and until the attachments became so large that they exceeded the Unrestricted Reserves").[11] According to plaintiffs, the FRBNY Funds must be treated as attachable Unrestricted Reserves because the Decrees failed to *exclude* the FRBNY Funds from being so designated. *See* Br. of Appellant EM 31–32 ("It makes no difference whether Argentina actually intended to pay the IMF from those funds, since the Decrees do not differentiate on that basis. To conclude otherwise would be to allow Argentina to utilize a problem of its own creation to evade its creditors.").

It is important to distinguish arguments which assert that the Decrees transferred to the Republic ownership or control over *the assets* of BCRA, *see, e.g., Karaha Bodas*, 313 F.3d at 90–92 (analyzing foreign state's ownership rights in assets possessed by instrumentality), from arguments that turn on the Republic's control over *BCRA itself.* The legal principles governing when a foreign state's control over its instrumentality permits attachment of the instrumentality's assets to satisfy a judgment against the state are well-established, *see post*, but were not addressed by plaintiffs in their submissions to the District Court or to this Court.

We conclude that (1) the Decrees did not alter property rights with respect to the FRBNY Funds—the assets that are the subject of the present appeal—but merely reflect the Republic's ability to exert control over BCRA itself, and (2) plaintiffs have not availed themselves of any arguments that would allow attachment of the FRBNY Funds based on the Republic's control over BCRA.

### 1. Control Over the FRBNY Funds

Plaintiffs' arguments concerning ownership of, and control over, the FRBNY Funds are not supported by the Decrees. The record is barren of any evidence that ownership or control over the FRBNY Funds was transferred to the Republic upon issuance of the Decrees, or that the Decrees required BCRA to use the FRBNY Funds, as opposed to other reserves, to repay the IMF. Rather than transferring funds to the Republic from BCRA, the Decrees and Resolution No. 49 directed BCRA to make reserves available to repay the IMF, and then to repay the IMF using those funds, leaving the decision of which specific funds would be used to BCRA's discretion. *See, e.g.*, Reply Br. of Appellant NML 13–14 n. 9 (acknowledging that "the Decrees fail to specify particular assets as Unrestricted Reserves").

While the Decrees may have manifested the Republic's ability and willingness to control BCRA, and to direct BCRA to use its assets for the benefit of the Republic, they did not cause control of BCRA's assets to change from BCRA to the Republic. To conclude otherwise would be to allow creditors of a foreign state to attach all of the assets of the state's central bank any time the foreign state issues directives

---

**11.** The scope of plaintiffs' claimed authority to attach assets held by BCRA would be vast. Even though only $8.4 billion in reserves were reclassified as Unrestricted Reserves pursuant to the Decrees, under plaintiffs' theory, *all* $26.8 billion in the various BCRA accounts around the world would be subject to attachment (until the attached funds reach $8.4 billion) because all that money would be *potentially* designated as Unrestricted Reserves—*i.e.,* because it is unclear *which* $18.4 billion would be classified as that necessary to back the monetary base and *which* $8.4 billion ($26.8 billion minus $18.4 billion) would be classified as "Unrestricted Reserves."

affecting the central bank's reserves.[12] Corporate law principles, which apply by analogy to the relationship between the Republic and its instrumentality BCRA, *see, e.g., First Nat'l City Bank v. Banco Para El Comercio Exterior de Cuba,* 462 U.S. 611, 628–33, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983) (*"Bancec"*) (applying corporate law principles to determine circumstances under which separate juridical status of government instrumentality must be disregarded), support this conclusion. *See Dole Food Co. v. Patrickson,* 538 U.S. 468, 475–76, 123 S.Ct. 1655, 155 L.Ed.2d 643 (2003) (holding that the FSIA did not affect underlying corporate law principles, and stating that "[a] corporate parent which owns the shares of a subsidiary does not, for that reason alone, own or have legal title to the assets of the subsidiary.... The fact that the shareholder is a foreign state does not change the analysis." (citations omitted)); *United States v. Wallach,* 935 F.2d 445, 462 (2d Cir.1991) ("[S]hareholders do not hold legal title to any of the corporation's assets. Instead, the corporation—the entity itself—is vested with the title." (citations omitted)); *see*

*also* 1 William Meade Fletcher, Cyclopedia of the Law of Corporations § 31 at 78, 84 (rev. ed. 2006) ("Shareholders, even the controlling shareholder, cannot transfer or assign the corporation's properties and rights, nor apply corporate funds to personal debts or objects ...." (footnotes omitted)).[13]

### 2. Control over BCRA

To the extent that plaintiffs' claim on the FRBNY Funds is based on the Republic's control over BCRA, as demonstrated by the Decrees, *see, e.g.,* Br. of Appellant EM 27–28 (arguing that the Republic's ability to appropriate BCRA's assets "with the stroke of a pen ... proves beyond question that the Argentine state controls not only the Unrestricted Reserves, but *all* of the Central Bank's assets"), plaintiffs have failed to avail themselves of well-established legal principles that might permit attachment. In *Bancec,* the Supreme Court stated that "government instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." 462

---

**12.** As the FRBNY points out, plaintiffs' theory could expose to attachment the assets of a majority of the world's central banks because national governments customarily retain the ability to direct their central banks to take actions with respect to the central banks' foreign exchange reserves. *See, e.g.,* M.H. de Kock, *Central Banking* 34–37, 312–18 (4th ed.1974). Under plaintiffs' theory, for example, all of the assets of the United States Federal Reserve system would be treated as attachable interests of the United States (absent otherwise-applicable sovereign immunity protections) because the United States has exercised the power to direct the Federal Reserve Banks to transfer their "surplus funds" to the U.S. Treasury for use by the federal government. *See, e.g.,* 12 U.S.C. § 289(b)(1) ("The Federal reserve banks shall transfer from the surplus funds of such banks to the Board of Governors of the Federal Reserve System for transfer to the Secretary of the Treasury for deposit in the general fund of the

Treasury, a total amount of $3,752,000,000 in fiscal year 2000.").

**13.** New York attachment law does not help plaintiffs. We noted in *Karaha Bodas* that the scope of attachment authorized by N.Y. C.P.L.R. § 5201 was limited by the scope of the judgment debtor's own interest in the attached property: "In New York, then, a party seeking to enforce a judgment 'stand[s] in the shoes of the judgment debtor in relation to any debt owed him or a property interest he may own.' Nonetheless, a party cannot 'reach ... assets in which the judgment debtor has no interest.' " *Karaha Bodas,* 313 F.3d at 83 (quoting *Bass v. Bass,* 140 A.D.2d 251, 528 N.Y.S.2d 558, 561 (1st Dep't 1988)). Here, because plaintiffs have not demonstrated that the Republic obtained any attachable interest in the FRBNY Funds as a result of the Decrees, plaintiffs have no right to attach the funds.

U.S. at 626–27, 103 S.Ct. 2591. According to the Court,

[f]reely ignoring the separate status of government instrumentalities would result in substantial uncertainty over whether an instrumentality's assets would be diverted to satisfy a claim against the sovereign, and might thereby cause third parties to hesitate before extending credit to a government instrumentality without the government's guarantee. As a result, the efforts of sovereign nations to structure their governmental activities in a manner deemed necessary to promote economic development and efficient administration would surely be frustrated.

*Id.* at 626, 103 S.Ct. 2591 (footnote omitted).

The Court found support for this proposition in the legislative history of 28 U.S.C. § 1610(b), *see* note 6, *ante* (quoting § 1610(b)), the provision of the FSIA addressing the circumstances under which a judgment creditor may execute upon the assets of an instrumentality of a foreign government:

Section 1610(b) will not permit execution against the property of one agency or instrumentality to satisfy a judgment against another, unrelated agency or instrumentality. There are compelling reasons for this. If U.S. law did not respect the separate juridical identities of different agencies or instrumentalities, it might encourage foreign jurisdictions to disregard the juridical divisions between different U.S. corporations or between a U.S. corporation and its independent subsidiary. However, a court might find that property held by one agency is really the property of another.

*Bancec,* 462 U.S. at 627–28, 103 S.Ct. 2591 (quoting FSIA House Report at 29–30, *as reprinted in* 1976 U.S.C.C.A.N. at 6628–29).

In *Bancec,* the Court held that the "presumption that a foreign government's determination that its instrumentality is to be accorded separate legal status will be honored," *id.* at 628, 103 S.Ct. 2591, could be overcome under certain circumstances, including where the instrumentality is "so extensively controlled by its owner that a relationship of principal and agent is created," *id.* at 629, 103 S.Ct. 2591, and where recognizing the instrumentality's separate juridical status would "work fraud or injustice," *id.* (quoting *Taylor v. Standard Gas Co.,* 306 U.S. 307, 322, 59 S.Ct. 543, 83 L.Ed. 669 (1939)) (internal quotation mark omitted); *see also Letelier v. Republic of Chile,* 748 F.2d 790, 794 (2d Cir.1984) ("The *Bancec* Court held that a foreign state instrumentality is answerable just as its sovereign parent would be if the foreign state has abused the corporate form, or where recognizing the instrumentality's separate status works a fraud or an injustice.").

Our respect for the separate juridical status of government instrumentalities led us to conclude in *Letelier* that the assets of Chile's state-owned airline, LAN, could not be executed upon to satisfy a judgment obtained against the Republic of Chile. *See Letelier,* 748 F.2d at 792, 799. We interpreted *Bancec* to establish a presumption that assets of a foreign government instrumentality could not be executed upon to satisfy a judgment against a parent foreign government. That presumption could be overcome only if the party seeking attachment carried its burden of demonstrating that the instrumentality's separate juridical status was not entitled to recognition. *See id.* at 794–95.

In *Letelier,* the district court had held that Chile's "direct control" of LAN's "assets and facilities," its power to use LAN's assets, its ability to "have decreed LAN's dissolution and taken over property inter-

ests held in LAN's name," and its use of the instrumentality's facilities and personnel to plan and carry out an assassination that gave rise to the judgment at issue in the case amounted to an abuse of corporate form justifying disregard of the instrumentality's separate juridical status. *Id.* at 794. We reversed, holding that

> [p]laintiffs had the burden of proving that LAN was not entitled to separate recognition. A creditor seeking execution against an apparently separate entity must prove the property to be attached is subject to execution. The evidence submitted by the judgment creditors does not reveal abuse of corporate form of the nature or degree that *Bancec* found sufficient to overcome the presumption of separate existence. As both *Bancec* and the FSIA legislative history caution against too easily overcoming the presumption of separateness, we decline to extend the *Bancec* holding to do so in this case.

*Id.* at 795 (citations and internal quotation marks omitted).

In a recent case, *LNC Invs., Inc. v. Republic of Nicaragua,* 115 F.Supp.2d 358 (S.D.N.Y.2000), *aff'd sub nom. LNC Invs., Inc. v. Banco Central de Nicaragua,* 228 F.3d 423 (2d Cir.2000), a district court applied *Bancec* to defeat the efforts of LNC Investments ("LNC"), a judgment creditor of the Republic of Nicaragua ("Nicaragua"), to execute on assets of Nicaragua's central bank held in the FRBNY. In that case, LNC obtained a judgment against Nicaragua based on its holdings of defaulted debt instruments issued by Nicaragua. To satisfy the judgment, LNC sought to execute on assets of Banco Central de Nicaragua—Nicaragua's central bank—held in the FRBNY, contending that Nicaragua had waived immunity from attachment of its central bank's assets and, in the alternative, that the central bank could be required to satisfy the judgment against Nicaragua. *See id.* at 360–63.

The district court rejected LNC's waiver argument, *see id.* at 361–63, and held that the central bank could be required to satisfy the judgment against its parent sovereign government only if LNC could overcome the *Bancec* presumption that the central bank's separate juridical status must be respected, *see id.* at 363. It concluded that LNC failed to prove that Nicaragua abused the central bank's corporate form (*i.e.,* that the central bank was the "alter ego" of Nicaragua), or that respecting the central bank's separate juridical status would work a fraud or injustice. *See id.* at 363–66.

We affirmed in a brief opinion in which we expressed our agreement with the district court's reasoning. *See LNC Invs.,* 228 F.3d at 423 ("The district court held that the Central Bank's assets could not be reached to satisfy the judgment against Nicaragua. We agree and affirm for substantially the reasons stated by the district court."). This result has been described by a commentator as "consistent with the outcome in a series of prior appellate decisions that had shown a strong aversion to overriding the presumption of independent status for separate corporate agencies or instrumentalities." Paul L. Lee, *Central Banks and Sovereign Immunity,* 41 Colum. J. Transnat'l L. 327, 364 (2003).[14]

---

**14.** Lee cites *Letelier* and the following cases from the Fifth and Eleventh Circuits in support of this proposition: *Alejandre v. Telefonica Larga Distancia de Puerto Rico, Inc.,* 183 F.3d 1277, 1281 (11th Cir.1999); *Hester Int'l Corp. v. Federal Republic of Nigeria,* 879 F.2d 170, 178–81 (5th Cir.1989); and *Hercaire Int'l, Inc. v. Argentina,* 821 F.2d 559, 565 (11th Cir.1987). *See* Lee, *ante,* at 362 n.137, 365 n.144.

We note that *Banco Central de Reserva del Peru v. Riggs Nat'l Bank,* 919 F.Supp. 13

*See also First City, Texas–Houston, N.A. v. Rafidain Bank,* 150 F.3d 172, 176 (2d Cir.1998) (using *Bancec* to analyze claim that central bank of Iraq should be held liable for Iraq-owned commercial bank's repudiation of debts as commercial bank's "alter ego"); *Olympic Chartering S.A. v. Ministry of Indus. and Trade of Jordan,* 134 F.Supp.2d 528, 530 (S.D.N.Y.2001) (rejecting claim by judgment creditor of Jordan's Ministry of Industry and Trade for jurisdictional discovery concerning the Central Bank of Jordan ("CBJ") because "petitioner has made no allegation that CBJ is an alter ego of the judgment debtor nor of 'fraud or injustice' involving CBJ" (quoting *Bancec,* 462 U.S. at 629, 103 S.Ct. 2591)).

We see no reason why the presumption of separateness required by *Bancec* and applied in *Letelier* and *LNC Investments*

should not apply here to shield the FRBNY Funds from attachment. The separate juridical status of BCRA is not disputed by plaintiffs,[15] and plaintiffs expressly elected not to argue in support of attachment that BCRA's separate juridical status should be disregarded because BCRA is the alter ego of the Republic. *See, e.g.,* Jan. 12, 2006 Hr'g Tr. 8, Special Appendix of Appellant EM 13 (counsel for EM acknowledging that the FRBNY Funds were "the central bank's property before the decree, subject to arguments which we think are legitimate arguments of ours that the central bank is the alter ego of the government. But that would still make it the central bank's property."); NML Reply Br. 21–22:

The reason Central Bank assets were not available before December 15, 2005, [the date on which the Decrees were

---

(D.D.C.1994), which plaintiffs relied upon in their briefs and at oral argument, also applied *Bancec* to a claim against the assets of Peru's central bank by a creditor of Peru (in that case, a claim for setoff). *See id.* at 16 ("As a general rule, courts must give great deference to the intent of foreign governments to establish separate entities." (citing *Bancec,* 462 U.S. at 626–27, 103 S.Ct. 2591)).

**15.** "A typical government instrumentality ... is created by an enabling statute that prescribes the powers and duties of the instrumentality, and specifies that it is to be managed by a board selected by the government in a manner consistent with the enabling law." *Bancec,* 462 U.S. at 624, 103 S.Ct. 2591. BCRA satisfies this description. Appellees submitted below an uncontradicted affidavit stating that BCRA is an independent legal entity "charged by statute with the power and responsibility of issuing and monitoring the stability of the Argentine currency (the Argentine peso), establishing and implementing monetary policy, and regulating the Argentine banking system and financial sector." Aff. of Juan Bosco ¶ 3, J.A. 393. BCRA's statutory charter, Law No. 24,144/92 (Oct. 22, 1992, as amended) (the "Charter"), indicates that BCRA is a "self-administered institution of the [Republic]" managed by an indepen-

dent Board of Directors appointed by the National Executive Power with the consent of the national Senate. Charter arts. 1, 6–7, J.A. 402–03. As an independent legal entity, BCRA has the legal authority to purchase and sell property in its own name, hold accounts in its own name, and sue and be sued in a court of law in its own name. Charter arts. 18, 33, 55, J.A. 407–08, 411, 414. In the District Court, plaintiffs did not dispute this characterization of BCRA's separate juridical status, and plaintiffs do not contest the statements in BCRA's appeal brief indicating that BCRA is a " 'self-administered institution' whose independence from the Republic's executive branch is mandated by the Argentine Constitution and Argentine law," Br. of Appellee BCRA 2 (quoting Charter art. 1)—except to the extent that plaintiffs argue BCRA's formal independence is belied by the Republic's extensive control over the central bank.

Furthermore, if plaintiffs believed that BCRA was not entitled to separate juridical status, they would not have needed to argue that the Decrees caused ownership or control of the FRBNY Funds to change from BCRA to the Republic upon issuance of the Decrees, because the FRBNY Funds would have been attachable assets of the Republic even before the Decrees were issued.

issued,] to be attached by *Argentina's* creditors is that the relevant debts are Argentina's and not the Central Bank's. Before President Kirchner decreed funds held by the Central Bank available to pay a debt of Argentina, appellants had no basis—*other than an alter ego argument, which they have not yet made in the District Court*—to argue that they were entitled to attach Central Bank funds to pay a debt of Argentina. (citation omitted) (second emphasis added). Nor have they argued that the *Bancec* presumption should be overcome based on a finding that disregarding BCRA's separate juridical status is necessary to prevent fraud or injustice.[16] In fact, neither EM nor NML even so much as mentions *Bancec* in its briefs.

We reject plaintiffs' effort to circumvent *Bancec* and our decisions in *Letelier* and *LNC Investments* by characterizing the Republic's ability and willingness to control BCRA as a transfer of property rights sufficient to give the Republic an attachable interest in the FRBNY Funds. Under *Bancec* and its progeny, plaintiffs bear the burden of overcoming the presumption that the FRBNY Funds are not available to satisfy a judgment against the Republic. *Bancec* indicates two circumstances in which the presumption may be overcome— if BCRA were proven to be the alter ego of the Republic, or if disregarding BCRA's separate juridical status were necessary to

avoid fraud or injustice. Plaintiffs chose not to argue that either of these circumstances existed here, even though the Republic's alleged misdeeds cited in plaintiffs' briefs might have lent some credence to these arguments.[17] *Bancec* forecloses any argument that all of BCRA's $26.8 billion in reserves are "attachable interests" of the Republic merely because the Republic hypothetically *could have* ordered (but in the Decrees did not order) BCRA to assign or transfer the FRBNY Funds. *See Letelier,* 748 F.2d at 794 (findings that assets and facilities of Chile's instrumentality LAN "were under the direct control of Chile, which had the power to use them; [and that] Chile could have decreed LAN's dissolution and taken over property interests held in LAN's name" did not support allowing creditor to attach LAN's assets in order to satisfy judgment against Chile).

## C. Use of Funds To Repay the IMF Is Not a "Commercial Activity"

■ Even if we agreed that the Decrees effectively converted all of BCRA's reserves—including the reserves held in the FRBNY Account—into attachable assets of the Republic, we could not authorize the pre- or postjudgment attachment of the FRBNY Funds unless we found that the account had become property of the Republic "used for a commercial activity in the United States."[18] 28 U.S.C. §§ 1610(a) & (d); *see* note 6, *ante* (quoting

---

**16.** This Court will not consider plaintiff's potential alter ego arguments in the first instance. *See Mellon Bank, N.A. v. United Bank Corp. of N. Y.,* 31 F.3d 113, 116 (2d Cir.1994) (declining to review an argument not raised before the district court when the party "clearly had the opportunity to raise" it below).

**17.** For example, the Republic's alleged interference with BCRA's affairs and efforts to remove attachable assets from the United States arguably could have supported disregarding BCRA's separate juridical status in

order to avoid fraud or injustice. This approach, rather than the legally unsupported one advanced by plaintiffs, might provide a means by which creditors could "avoid allowing Argentina to play a shell game to deprive creditors of their legitimate remedies." Br. of Appellant NML 36.

**18.** We note, however, that if we agreed with plaintiffs' arguments concerning the effect of the Decrees on ownership and control of the FRBNY Funds, it would not be necessary to consider plaintiffs' arguments regarding the effect of the Republic's waiver on BCRA, as

relevant portions of § 1610). Plaintiffs essentially concede as much by arguing that the Unrestricted Reserves are attachable because they were "used for a commercial activity." *See* Br. of Appellant EM 32–36 (arguing that Unrestricted Reserves are attachable because they have been "used for a commercial activity"); Br. of Appellant NML 37–47 (same).[19]

Plaintiffs contend that the Republic's use of the FRBNY Funds constituted "a commercial activity in the United States" under 28 U.S.C. § 1610(a) because the funds could have been used to repay the Republic's debt to the IMF. They rely on *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992), in which the Supreme Court held that Argentina's issuance of commercial bonds constituted "commercial activity" under the FSIA, *see id.* at 615–17, 112 S.Ct. 2160, to argue that a government's

---

the Republic indisputably waived its assets' immunity from attachment under 28 U.S.C. §§ 1610(a)(1) and (d)(1). *Cf. Rafidain Bank*, 150 F.3d at 174 (noting that if central bank were alter ego of other instrumentality, central bank would be subject "to jurisdiction under the FSIA's commercial activity exception to immunity to the same extent as [the other instrumentality]").

**19.** Plaintiff EM does argue in the alternative that the FRBNY Funds should not be immune from attachment because the Republic "went beyond merely waiving the immunity of those Reserves in the documents underlying [its] bond; it affirmatively pledged *not to assert* such immunity in proceedings to enforce the Judgment." Br. of Appellant EM 46 (emphasis in original). EM relies on *Caribbean Trading and Fid. Corp. v. Nigerian Nat'l Petroleum Corp.*, 948 F.2d 111 (2d Cir.1991), in support of this argument.

EM's argument is without merit. As stated earlier, the Republic "irrevocably agreed not to claim and has irrevocably waived . . . immunity to the fullest extent permitted by the laws of [the] jurisdiction. . . ." By its explicit terms, the scope of the Republic's agreement not to claim immunity is coextensive with its waiver of immunity; both reach only to the "extent permitted under the laws of [the] jurisdiction." The FSIA explicitly protects all "property in the United States of a foreign state . . . from attachment arrest and execution except as provided in" 28 U.S.C. §§ 1610 & 1611. 28 U.S.C. § 1609. Under the laws of this jurisdiction, courts may grant the remedies of attachment, arrest and execution against a foreign state's property only if the property is eligible for attachment under a specific provision of the FSIA. *See, e.g., Conn. Bank of Commerce v. Republic of Congo*, 309 F.3d 240, 247 (5th Cir.2002) ("[I]f a foreign

sovereign waives its immunity from execution, U.S. courts may execute against 'property in the United States . . . used for a commercial activity in the United States.' 28 U.S.C. § 1610(a)(1). Even when a foreign state completely waives its immunity from execution, courts in the U.S. may execute only against property that meets these two statutory criteria."); *accord LNC Invs., Inc. v. Republic of Nicaragua*, No. 96 Civ. 6360(JFK), 2000 WL 745550, at *3 (S.D.N.Y. June 8, 2000). To conclude otherwise would render meaningless the provisions of §§ 1610(a) & (d), which subject to attachment property of a foreign state when the property is "used for a commercial activity" *and* when the foreign state "has waived its immunity from attachment," 28 U.S.C. § 1610(a)(1); *see also id.* § 1610(d)(1) (permitting prejudgment attachment of a foreign state's property "used for a commercial activity" only where "the foreign state has explicitly waived its immunity from attachment prior to judgment").

*Caribbean Trading* does not support a contrary conclusion. In *Caribbean Trading*, we found that a foreign state instrumentality waived the right to assert immunity from attachment provided by the FSIA by failing to timely assert it in the litigation in accordance with procedural rules governing all litigants. *See Caribbean Trading*, 948 F.2d at 115. We noted, however, that "[t]his wholly procedural rule does not infringe on the prerogatives of a foreign state under the FSIA. It merely imposes orderly procedures upon the assertion of those prerogatives." *Id.* We need not consider here what remedy, if any, a judgment creditor might have against a foreign state that violated an explicit promise not to assert any of the non-waivable protections of the FSIA in attachment proceedings, because the Republic did not make any such promise to plaintiffs.

repayment of debt *always* constitutes "commercial activity" within the meaning of the FSIA. Under this reasoning, the Republic engaged in "commercial activity" when BCRA repaid the Republic's debt to the IMF.

We disagree with plaintiffs' argument on two separate and independent grounds. First, we hold that the Republic's relationship with the IMF is not "commercial" in nature; thus, use of Unrestricted Reserves to repay the IMF did not constitute "commercial activity." Second, even if we assumed that the Republic's relationship with the IMF was "commercial" in nature, plaintiffs have failed to show on the present record that any of the FRBNY Funds were to be "used" to pay the IMF.

The FSIA's definition of "commercial activity" states that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). According to the Supreme Court in *Weltover*, "[a] foreign state engaging in 'commercial' activities 'do[es] not exercise powers peculiar to sovereigns'; rather, it 'exercise[s] only those powers that can also be exercised by private citizens.' " 504 U.S. at 614, 112 S.Ct. 2160 (second and third alterations in original) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 704, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976) (plurality opinion)). This led the Court to conclude that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the mean-

ing of the FSIA.... [T]he issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.' " *Id.* (quoting Black's Law Dictionary 270 (6th ed.1990)). The Court concluded in *Weltover* that Argentina engaged in "commercial activity" within the meaning of the FSIA when it issued commercially-available debt instruments, because the instruments were "in almost all respects garden-variety debt instruments: They may be held by private parties; they are negotiable and may be traded on the international market (except in Argentina); and they promise a future stream of cash income." *Id.* at 615, 112 S.Ct. 2160.

The Republic's borrowing relationship with the IMF, and the repayment obligations assumed thereunder, are not similarly "commercial" for several reasons. First, when the Republic borrows from the IMF, it "exercise[s] powers peculiar to sovereigns." *Id.* at 614, 112 S.Ct. 2160. The IMF is a unique cooperative international institution established by treaty— the Bretton Woods Agreement—following the end of the Second World War. *See* Articles of Agreement of the IMF, 60 Stat. 1401, T.I.A.S. 1501 (Dec. 27, 1945). The Bretton Woods Agreement has since been amended twice, most recently in 1976, *see* Second Amendment of Articles of Agreement of the International Monetary Fund, Apr. 30, 1976, 29 U.S.T. 2203, T.I.A.S. No. 8937 ("IMF Agreement"), *available at* http://www.imf.org/external/pubs/ft/aa/aa. pdf.[20] Only sovereign nation states can become members of the IMF, *see* IMF Agreement art. II, 29 U.S.T. at 2205–06, and only members can avail themselves of

---

**20.** The United States Governor of the IMF was given statutory authority to accept the amendments by the Bretton Woods Agreements Act of 1976, Pub.L. No. 94–564, 90 Stat. 2660. *See Trans World Airlines, Inc. v.*

*Franklin Mint Corp.*, 466 U.S. 243, 249–50, 104 S.Ct. 1776, 80 L.Ed.2d 273 (1984) (discussing 1976 amendments to the Bretton Woods Agreement).

IMF financing, *see id.* arts. IV–V, 29 U.S.T. at 2208–20. The Republic is one of 184 sovereign nations that are members of the IMF. *See* IMF, *Members' Quota and Voting Power,* http://www.imf.org/external/np/sec/memdir/members.htm.

Second, the IMF's borrowing program is part of a larger regulatory enterprise intended to preserve stability in the international monetary system and foster orderly economic growth. *See* IMF Agreement art. IV § 1, 29 U.S.T. at 2208 (describing requirement that each member "undertakes to collaborate with the Fund and other members to assure orderly exchange arrangements and to promote a stable system of exchange rates"); *id.* § 3, 29 U.S.T. at 2209 (granting the IMF the power "to oversee the international monetary system in order to ensure its effective operation" by "exercis[ing] firm surveillance over the exchange rate policies of members"). The Republic's borrowing relationship with the IMF is regulatory in nature because the IMF's provision of foreign currency or IMF-specific assets in exchange for domestic currency, *see post* (discussing unique nature of IMF loan arrangements), generally requires regulatory action by the Republic. *See Fact Sheet— IMF Lending,* http://www.imf.org/external/np/exr/facts/howlend.htm ("An IMF loan is usually provided under an 'arrangement,' which stipulates the specific policies and measures a country has agreed to implement to resolve its bal-

ance of payments problem."); *see also* Sandra Blanco & Enrique Carrasco, *The Functions of the IMF and the World Bank,* 9 Transnat'l L. & Contemp. Probs. 67, 75 (1999) (describing IMF loans beyond a minimum size as entailing "the explicit commitment by the member country to implement remedial measures in return for IMF assistance .... Those measures typically have related to the domestic money supply, budget deficits, international reserves, external debt, exchange rates, and interest rates."). The Republic agreed to many economic policy and regulatory reform measures in exchange for the IMF loans that were ultimately repaid in 2005. *See* IMF Independent Evaluation Office, *The IMF and Argentina, 1991–2001* 17–38 (2004) (describing and evaluating IMF's efforts to influence Argentina's exchange rate and fiscal policies, and to encourage structural reforms, in exchange for providing Argentina access to IMF capital); *see also Weltover,* 504 U.S. at 614, 112 S.Ct. 2160 (concluding that "a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party").[21]

Third, the terms and conditions of the Republic's borrowing relationship with the IMF are not governed by a "garden-variety debt instrument[ ]," *id.* at 615, 112 S.Ct. 2160, but instead by the Republic's

---

21. We do not mean to imply that a loan becomes non-"commercial" any time a sovereign debtor agrees to take regulatory actions in connection with the receipt of the loan—for example, in order to become more attractive to potential lenders, or in order to satisfy terms and conditions of the loan. *Cf. Weltover,* 504 U.S. at 616, 112 S.Ct. 2160 (rejecting argument that Argentina's issuance of bonds was non-commercial because the bonds were created "under a foreign ex-

change program designed to address a domestic credit crisis"). We merely point out that the relationship between the Republic and the IMF, a multilateral organization, is non-commercial in a way that the Republic's relationship with commercial lenders cannot be because of the unique role that the IMF plays in regulating the international monetary system by intervening in the economies of its members.

treaty obligations to the international organization, as supplemented by the terms and conditions contained in agreements associated with individual loans. If the Republic failed to comply with these obligations, it would be in breach of the IMF Agreement and as a result could lose its rights to use IMF borrowing facilities, participate in IMF governance, and ultimately, remain a member of the IMF. *See* IMF Agreement art. v. § 5, 29 U.S.T. at 2213; *id.* art. XXVI § 2, 29 U.S.T. at 2254. The vehicle for enforcing the Republic's obligations to the IMF is diplomatic and thus sovereign, not commercial. *See MCI Telecommunications Corp. v. Alhadhood,* 82 F.3d 658, 663 (5th Cir.1996) ("We find that alleged promises made through diplomatic channels do not constitute commercial activity.").

Fourth, IMF loans are structured in a manner unique to the international organization, and are not available in the commercial market. Instead of obtaining currency in exchange for debt instruments, IMF debtors purchase "Special Drawing Rights" ("SDRs") or other currency from the IMF *in exchange for their own currency. See* IMF Agreement art. V § 2(a), 29 U.S.T. at 2210 (stating that, with certain exceptions, "transactions on the account of the Fund shall be limited to transactions for the purpose of supplying a member, on the initiative of such member, with special drawing rights or the currencies of other members from the general resources of the Fund ... in exchange for the currency of the member desiring to make the purchase"); *id.* art. XVII §§ 2–3, 29 U.S.T. at 2239–40 (discussing who may hold SDRs); *see also* Blanco & Carrasco, *ante,* at 74 ("Although the IMF's assistance is usually referred to as 'lending' or 'loans,' a member country actually 'purchases' SDRs or other currencies from the Fund in exchange for its own currency and agrees to 'repurchase' (buy back) its

own currency at a later date."). Because a nation state's borrowing relationship with the IMF takes place outside of the commercial marketplace, it cannot be considered "commercial" in nature. *Compare Weltover,* 504 U.S. at 617, 112 S.Ct. 2160 (holding that Argentina "participated in the bond market in the manner of a private actor" when it issued bonds).

Even if we were to regard repayment of IMF debts as "commercial activity" within the meaning of §§ 1610(a) and (d), we would be required to hold that, on the present record, the FRBNY Funds are not available for attachment under § 1610 because the FRBNY Funds were never *"used for* commercial activity," and plaintiffs presented no evidence to the District Court that the Republic or BCRA intended the FRBNY Funds to be so designated. *See* 28 U.S.C. § 1610(a) (requiring attachable property to be *"used for* a commercial activity" (emphasis added)); *id.* § 1610(d) (same as to prejudgment attachment). We need not define the precise contours of "used for" within the contemplation of § 1610 because there is no evidence that either actual use or designation for use occurred here with respect to the FRBNY Funds. The mere fact that the FRBNY Funds *could have* been used to repay the Republic's debts to the IMF after the Decrees does not, standing alone, render those funds attachable. *See Conn. Bank of Commerce v. Republic of Congo,* 309 F.3d 240, 254 (5th Cir.2002) (noting that the phrase "used for" in § 1610(a) "means what it says: property of a foreign sovereign ... may be executed against only if it is 'used for' a commercial activity"). The plain language of the statute suggests that the standard is actual, not hypothetical, use. *See Walker Int'l Holdings Ltd. v. Republic of Congo,* 395 F.3d 229, 236 (5th Cir.2004) (property not "used for" reimbursement of legal expenses where agree-

ments never moved beyond negotiation stage). Even if actual use were not required, at least specific designation for such use would be necessary. *Cf. Af–Cap Inc. v. Republic of Congo*, 383 F.3d 361, 370 (5th Cir.2004) ("Although ... contemplated use is not actual use, it is strongly suggestive that the [funds at issue] were not cordoned off for use of [the state] in its sovereign capacity." (footnote omitted)).

Here, though, the Decrees made *all* BCRA funds *potentially* available for the repayment of the Republic's debts, and never specified which funds would be used to back the monetary base and which funds would be designated Unrestricted Reserves. Accordingly, plaintiffs cannot demonstrate on the basis of the Decrees alone that the FRBNY Funds were intended to be "used for" repaying the IMF.

D. The FRBNY Funds Are Immune From Attachment Even Without Reference to Section 1611(b)(1)

 The parties have offered a variety of interpretations of 28 U.S.C. § 1611(b)(1)'s provision granting immunity

from attachment for property "of a foreign central bank ... held for its own account," provided that the central bank's immunity is not "explicitly waived." 28 U.S.C. § 1611(b)(1). But because the FRBNY Funds have remained assets of BCRA that cannot be used to satisfy a judgment against the Republic, we need not decide which interpretation of § 1611(b)(1)'s "held for its own account" language is correct in order to resolve this appeal. Section 1611(b)(1) provides a central bank with special protections *from* a judgment creditor who would otherwise be entitled to attach *the central bank's funds* under 28 U.S.C. § 1610. *See* 28 U.S.C. § 1611(b)(1) (protecting from attachment assets of a central bank "[n]otwithstanding the provisions of section 1610"). We have already held that plaintiffs have not established their right to attach the FRBNY Funds. Thus, even assuming *arguendo* that the FRBNY Funds were not "held for [BCRA's] own account," or that the Republic explicitly waived BCRA's immunity from attachment,[22] plaintiffs would remain unable to attach the FRBNY Funds.

**22.** Without reaching these issues, we note that there is little support for plaintiffs' arguments that the FRBNY Funds were no longer held for BCRA's "own account" upon issuance of the Decrees, or that BCRA's immunity from attachment was explicitly waived. With respect to § 1611(b)(1)'s "held for its own account" language, central banks regularly execute transactions with the IMF on behalf of their parent governments; IMF members are required to designate a fiscal agent for financial transactions with the IMF, and the vast majority of members designate their respective central banks. *See* IMF Agreement art. V, § 1, 29 U.S.T. at 2210; IMF Treasurer's Department, Pamphlet No. 45, *Financial Organization and Operations of the IMF*, at 84 (6th ed.2001) (noting that "most members of the IMF have designated their central bank as ... the fiscal agency"). Thus, the legislative history of Section 1611(b)(1), discussed *ante*, would support the conclusion that even if BCRA had decided to use the FRBNY Funds

to repay the IMF, the funds would continue to be held for BCRA's "own account," 28 U.S.C. § 1611(b), because the funds would be "used or held in connection with central banking activities," FSIA House Report at 31, *as reprinted in* 1976 U.S.C.C.A.N. at 6630.

Turning to plaintiff's waiver arguments, although the Republic's waiver of immunity from attachment is worded broadly, it does not appear to clearly and unambiguously waive BCRA's immunity from attachment, as it must do in order to be effective. *See Libra Bank Ltd. v. Banco Nacional de Costa Rica*, 676 F.2d 47, 49 (2d Cir.1982) (requiring explicit waiver of immunity from prejudgment attachment under 28 U.S.C. § 1610(d) to be "clear and unambiguous"). The Republic's waiver of immunity mentions certain reserves that are held by BCRA, but it makes no mention of BCRA itself, and does not state that it is waiving BCRA's immunity from attachment. *See* 28 U.S.C. § 1611(b)(1) (waiver only effective with respect to a "bank or au-

Our interpretation of Section 1611(b)(1) is in accord with the district court's opinion in *LNC Investments,* which found persuasive the Nicaraguan central bank's argument that its assets could not be attached to satisfy a judgment against Nicaragua even if Nicaragua waived the central bank's immunity from attachment:

> [a]lthough a parent government may waive the immunity of its central bank pursuant to § 1611, nothing in the clear language of § 1611 remotely suggests that such a waiver automatically renders a central bank liable for a judgment entered against its parent government. Section 1611 simply demonstrates that the assets of a foreign bank can be attached and executed to satisfy a judgment entered *against that foreign central bank* when, and only when, the central bank or its parent government has made an explicit waiver of the bank's immunity.

*LNC Invs., Inc. v. Republic of Nicaragua,* 115 F.Supp.2d 358, 362–63 (S.D.N.Y.2000) (alteration and emphasis in original), *aff'd sub nom. LNC Invs., Inc. v. Banco Central De Nicaragua,* 228 F.3d 423 (2d Cir. 2000); *see also* Paul L. Lee, *Central Banks and Sovereign Immunity,* 41 Colum. J. Transnat'l L. 327, 395 (2003) ("[W]hether or not the central bank has explicitly waived immunity and whether or not the funds constitute funds held for the central bank's own account, property of the central bank will be subject to attachment or execution only for claims against the central bank and not for claims that pertain only to the government or its other agencies and instrumentalities.").

**E. The District Court Properly Denied EM's Discovery Request**

■ We are mindful that a federal trial court has wide latitude over the management of discovery, *see Wills v. Amerada Hess Corp.,* 379 F.3d 32, 41 (2d Cir.2004), but in the FSIA context, "discovery should be ordered circumspectly and only to verify allegations of specific facts crucial to an immunity determination." *First City, Texas–Houston, N.A. v. Rafidain Bank,* 150 F.3d 172, 176 (2d Cir.1998) (quoting *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 534 (5th Cir.1992) (internal quotation marks omitted)); *cf. Kelly v. Syria Shell Petroleum Dev. B.V.,* 213 F.3d 841, 849 (5th Cir.2000) ("FSIA immunity is immunity not only from liability, but also from the costs, in time and expense, and other disruptions attendant to litigation."). Because the record makes clear that the FRBNY Funds were never an attachable asset of the Republic and that § 1610's "commercial activity" exception to immunity from attachment does not apply, EM was "not entitled to any other discovery," as it has failed to "show[ ] a reasonable basis for assuming jurisdiction" over BCRA. *Rafidain Bank,* 150 F.3d at 177 (quoting *Filus v. Lot Polish Airlines,* 907 F.2d 1328, 1332 (2d Cir.1990)). There is no indication on this record that the District Court improperly calibrated the "delicate balancing 'between permitting discovery to substantiate exceptions to statutory foreign sovereign immunity and protecting a sovereign's or sovereign agency's legitimate claim to immunity from discovery.'" *Id.* at 176 (quoting *Arriba,* 962 F.2d at 534).

**CONCLUSION**

For the reasons stated above, plaintiffs' motion for certification of the appeal pursuant to 28 U.S.C. § 1292(b) is granted. The order of the District Court vacating

thority" if it, "or its parent foreign government, has explicitly waived *its* immunity from

attachment in aid of execution" (emphasis added)).

the Amended Restraining Notices is affirmed.