**NML CAPITAL, LTD., Plaintiff,**

v.

**SPACEPORT SYSTEMS INTERNATIONAL, L.P., a Delaware limited partnership; The Republic of Argentina, a foreign state; and does 1–10, Defendants.**

No. CV 11–03507 SJO (RZx).

United States District Court, C.D. California.

May 25, 2011.

**1114**

Anthony P. Alden, Bruce E. Van Dalsem, Harold A. Barza, Quinn Emanuel Urquhart and Sullivan LLP, Jaime W. Marquart, Baker Marquart LLP, Los Angeles, CA, Eric C. Kirsch, Robert Allen Cohen, Dechert LLP, New York, NY, for Plaintiff.

John A O'Malley, Stephanie Anne Stroup, Fulbright and Jaworski LLP, Carl L. Grumer, Donald R. Brown, Manatt Phelps and Phillips LLP, Los Angeles, CA, Carmine D. Boccuzzi, Jonathan I. Blackman, Sara A. Sanchez, Cleary Gottlieb Steen & Hamilton LLP, New York, NY, for Defendants.

## ORDER DENYING PLAINTIFF'S EX PARTE APPLICATION FOR TEMPORARY PROTECTIVE ORDER, TEMPORARY RESTRAINING ORDER, AND ORDER TO SHOW CAUSE [Docket No. 2]

S. JAMES OTERO, District Judge.

This matter is before the Court on Plaintiff NML Capital, Ltd.'s ("Plaintiff") Ex Parte Application for Temporary Protective Order, Temporary Retraining Order, and Order to Show Cause ("Application"), filed on April 25, 2011. (Docket No. 2.) Defendants Republic of Argentina ("Argentina") and Spaceport Systems International, L.P. ("Spaceport") (collectively, "Defendants") submitted Oppositions to Plaintiff's Application on May 2, 2011, and May 5, 2011, respectively. Plaintiff filed Replies to Defendants' Oppositions on May 2, 2011, and May 6, 2011.[1] The United

---

1. On May 2, 2011, Plaintiff simultaneously filed an Ex Parte Application to Exceed Page Limitation for Its Reply and a Reply to Defendant Argentina's Opposition. The Court's Initial Standing Order mandates that "[n]o reply may exceed five pages." (Standing Order ¶ 19.) As such, the Court denied Plaintiff's Ex Parte Application to Exceed Page Limitation on May 4, 2011. Plaintiff has not re-filed a Reply to Defendant Argentina's Opposition that is in compliance with both the Court's Standing Order and the Order Denying Plaintiff's Ex Parte Application to Exceed Page Limitation. Plaintiff filed a pleading entitled "Reply in Support of Application for Order for Temporary Protective Order" on May 9, 2011. The 24–page filing, however, relates to Plaintiff's Application for Right to Attach Order and Order for Writ of Attachment, pending before the Honorable Magistrate Judge

States lodged a Statement in opposition to Plaintiff's Application as an interested party. The Court granted permission for Plaintiff to file a Response to the United States' Statement. The Court found this matter suitable for disposition without oral argument. *See* Fed.R.Civ.P. 78(b). For the following reasons, Plaintiff's Application is **DENIED**.

## I. *FACTUAL AND PROCEDURAL BACKGROUND*

In the parties' colorful words, this suit is between "an offshore 'vulture' hedge fund" and a "scofflaw," "serial debt defaulter." (Appl. 2:16, 17:11; Argentina's Opp'n 1:13.) The parties do not dispute most of the facts of the instant action. Plaintiff is a limited liability corporation organized under Cayman Islands law and headquartered in the Cayman Islands. (Compl. ¶ 2.) Defendant Spaceport is a limited partnership organized under Delaware law and with a principal place of business in Lompoc, California. (*Id.* ¶ 3.) Defendant Argentina is a foreign state. (*Id.* ¶ 4.)

In December 2001, Defendant Argentina suspended interest and principal payments to holders of $80 billion in public external debt. (Appl. Mem. P. & A. 2:10–11; Argentina's Opp'n 4:15–20.) Plaintiff, as a holder of the bonds, brought suits against Defendant Argentina. (Appl. Mem. P. & A. 2:20–22; Argentina's Opp'n 5:9–11 ("NML has pursued aggressive attachment and execution efforts against the Republic both inside and outside the United

States....").) Plaintiff obtained five judgments against Defendant Argentina. (Decl. of Bruce E. Van Dalsem in Supp. of Appl. ("Van Dalsem Decl.") ¶¶ 5, 6.) One of those judgments pertains to *NML Capital, Ltd. v. Republic of Argentina*, Case No. 03–CIV–8845, which has no pending appeals. (*Id.* Ex. C.) In that case, Plaintiff obtained a money judgment in the amount of $284,184,632; approximately $66,570,917.36 in post-judgment interest has accrued on the judgment. (*Id.* ¶ 5.) On April 25, 2011, Plaintiff registered that judgment against Plaintiff with the Court. (Appl. Mem. P. & A. 3:4–5.)

Defendant Argentina established the Argentine Comisión Nacional de Actividades Espaciales (Argentine National Space Activities Commission ("CONAE")) in 1991 through a presidential decree. (Van Dalsem Decl. Ex. E.) CONAE is obligated "to undertake, design, execute, control, manage and administer space projects and undertakings ... for peaceful purposes." (*Id.*) CONAE and the United States' National Aeronautics and Space Administration (NASA) entered into an international Memorandum of Understanding (the "MOU") in March 2004 to jointly develop and implement a project called Aquarius. (Decl. of Eric E. Ianson in Supp. of the United States' Statement ("Ianson Decl.") ¶¶ 8, 11.) The objective of the Aquarius project is to launch the Aquarius/Satélite de Aplicaciones Científicas (Scientific Applications Satellite) ("Aquarius/SAC–D Satellite"),[2] which will "make pioneering

Ralph Zarefsky. Due to Plaintiff's failure to comply with the Court's multiple Orders, the Court declines to read Plaintiff's Reply after the fifth page. The parties are on notice that the Initial Standing Order should be strictly followed.

Plaintiff also filed an Ex Parte Application for Leave to File a Response to Defendant Spaceport's Opposition on May 6, 2011. The Court granted Plaintiff's request on May 16, 2011. The Court deems Plaintiff's "Re-

sponse" to Defendant Spaceport's Opposition as a Reply. As with its Reply to Defendant Argentina's Opposition, the Court declines to read beyond the fifth page of Plaintiff's Reply to Defendant Spaceport's Opposition. (*See* Standing Order ¶ 19.)

2. The Aquarius/SAC–D Satellite is often also referred to as the Aquarius/SAC–D "Observatory" by the parties.

space-based measurements of Sea Surface Salinity (SSS) with the precision, resolution, and coverage needed to characterize salinity variations and investigate the linkage between ocean circulation, the Earth's water cycle, and climate variability." (*Id.* ¶ 5.) Other important goals of the mission are to "[m]onitor[ ]natural disasters, fires, volcanic events, agriculture, land use, and other environmental variables" and to learn "[t]he relationship between regional soil moisture and essential climate variables . . . on the appearance and spread of diseases." (Van Dalsem Decl. Ex. M at 3.) Data collected by the Aquarius/SAC–D Satellite "will be analyzed . . . for up to six months after launch, at which time the data products will be released to the general science community." (*Id.* Ex. M at 4.)

The Aquarius/SAC–D Satellite is comprised of instruments contributed by CONAE, NASA, the Agenzia Spaziale Italiana of Italy, the Centre National d'Etudes Spatiales of France, and the Canadian Space Agency of Canada. (Decl. of Donald R. Brown in Supp. Argentina's Opp'n ("Brown Decl.") Ex. A at 6; Ianson Decl. ¶ 13.) Pursuant to the MOU, CONAE provided the spacecraft bus, which supplies the power and communications to all instruments in the satellite. (Ianson Decl. ¶ 12; Decl. of Keith J. Volkert in Supp. of Reply ("Volkert Decl.") ¶ 8.) NASA contributed the rocket and the Aquarius instrument that will measure the sea surface salinity. (Ianson Decl. ¶ 12.) NASA has expended approximately $250,000,000 on the Aquarius project. The Aquarius/SAC–D Satellite is currently at the Vandenberg Air Force Base undergoing final tests and preparation for a launch scheduled on June 9, 2011. (*Id.* ¶¶ 16–20.) NASA can support a delay in the launch up to July 15, 2011, after which the Aquarius/SAC–D Satellite cannot be launched until February 2012. (*Id.* ¶¶ 20, 21.) Were the launch to be delayed until February 2012,

NASA estimates that it will incur a direct cost of $30,000,000 to $40,000,000. (*Id.* ¶ 22.) Moreover, NASA represents that interference, at this stage, may frustrate its relationship with other foreign space agencies on future collaborative efforts. (*Id.* ¶ 27.)

On April 25, 2011, Plaintiff filed a Complaint for Creditor's Suit. Simultaneously, Plaintiff submitted an Ex Parte Application for Temporary Protective Order ("TPO"), Temporary Restraining Order ("TRO"), and Order to Show Cause. Plaintiff asks the Court to place a temporary lien on the Aquarius/SAC–D Satellite and to prevent Defendants and the United States from transferring or launching the Aquarius/SAC–D Satellite for at least 40 days. (Appl. 2:6–23.)

## II. DISCUSSION

### A. Legal Standards

#### 1. Temporary Protective Order

 Federal Rule of Civil Procedure ("Rule") 64 states: "[E]very remedy is available that, under the law of the state where the court is located, provides for seizing a person or property to secure satisfaction of the potential judgment." Fed.R.Civ.P. 64. Therefore, Rule 64 "permits state seizure provisions to be used in federal courts." *Reebok Int'l, Ltd. v. Marnatech Enters., Inc.*, 970 F.2d 552, 558 (9th Cir.1992). Pursuant to California law, "[a]t the time of applying for a right to attach order . . . the plaintiff may apply . . . for a temporary protective order." CAL.CODE CIV. PROC. § 486.010 (2006). A court may issue a TPO on an ex parte basis only if it finds the following: (1) the claim is one upon which an attachment may be issued; (2) the plaintiff has established the probable validity of the claim; (3) the order is not sought for a purpose other than the recovery of the claim; and

(4) the plaintiff will suffer great or irreparable injury if the TPO is not issued. *Id.* § 486.020. " 'Probable validity' requires the plaintiff to 'show that it is more likely than not it will obtain a judgment against the defendant.' " *Rose v. Abraham*, No. CIV–F–08–606, 2008 WL 2275573, at *3 (E.D.Cal. May 21, 2008).

### 2. *Temporary Restraining Order*

 "The standard for issuing a temporary restraining order is identical to the standard for issuing a preliminary injunction." *Lockheed Missile & Space Co. v. Hughes Aircraft Co.*, 887 F.Supp. 1320, 1323 (N.D.Cal.1995) (applying standard to a request for a TRO); *see also Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987) (applying the same standard for a preliminary injunction); *Lee v. U.S. Taekwondo Union*, 331 F.Supp.2d 1252, 1261 (D.Haw.2004) ("The standard for granting a temporary restraining order ... is identical to that for a preliminary injunction."). In *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 129 S.Ct. 365, 374, 172 L.Ed.2d 249 (2008), the Supreme Court held that a plaintiff seeking a preliminary injunction must establish that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in its favor; and (4) an injunction is in the public interest. "Under *Winter*, plaintiffs must establish that irreparable harm is *likely*, not just possible, in order to obtain a preliminary injunction." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.2011).[3] In the Ninth Circuit, " 'serious questions going to the merits' and a hardship balance that tips sharply toward the plaintiff can [also] support issuance of an injunction, assuming the other two elements of the *Winter* test are also met." *Id.* at 1132, 1135 (holding that the "sliding scale" test remains viable "so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest"). "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*, 129 S.Ct. at 376.

 A higher court "review[s] the grant or denial of a preliminary injunction for abuse of discretion." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir.2009); *see also Woratzeck v. Ariz. Bd. of Exec. Clemency*, 117 F.3d 400, 402 (9th Cir.1997) (reviewing a district court's order denying a motion for a TRO under an abuse of discretion standard). The review is "limited and deferential," and does not extend to "the underlying merits of the case." *Am. Trucking Ass'ns*, 559 F.3d at 1052. "Stated differently, [a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case." *Id.* (quotations omitted and edits in original).

### B. *Probable Validity of the Claim*

Plaintiff asserts that a TPO should issue because Plaintiff can demonstrate that it is more likely than not to prevail on its post-judgment creditor's Complaint. For Plaintiff to prevail on its claim, the parties agree that an exception under 28 U.S.C. § 1610(a) ("§ 1610(a)") of the Foreign Sovereign Immunities Act (the "FSIA") must

---

**3.** Plaintiff misstates the law when it argues that "a combination of probable success on the merits and the *possibility* of irreparable injury" is sufficient for the issuance of a TRO. (Appl. Mem. P. & A. 8:17–18.) The Ninth Circuit has recognized that the Supreme Court in *Winter*, 129 S.Ct. at 375–76, abrogated that aspect of the appellate court's approach to preliminary injunctions. *See Cottrell*, 632 F.3d at 1131.

apply. (*See* Appl. Mem. P. & A. 12:2–4; Argentina's Opp'n 10:1–4.) Plaintiff alleges that the Aquarius/SAC–D Satellite may be executed upon because Defendant Argentina has waived immunity and the Satellite is being "used for a commercial activity in the United States." (Appl. Mem. P. & A. 13:6–15:7; Reply to Argentina's Opp'n 1:15–5:28.) Defendant Argentina and the United States argue that, although immunity has been waived, the Aquarius/SAC–D Satellite is immune from execution because it is neither being used in the United States nor will it be utilized for commercial activity. (Argentina's Opp'n 10:11–14:18; United States' Statement 4:25–12:13.)

### 1. The Court Assumes CONAE Is Not a Separate Juridical Entity.

■ As an initial matter, the Court must first address whether CONAE is a separate juridical entity before determining the applicability of any FSIA exception. "[A] separate juridical entity ... cannot be held liable for [a] judgment against [a foreign state]." *See Flatow v. Islamic Republic of Iran*, 308 F.3d 1065, 1071 (9th Cir.2002).[4] Thus, were CONAE to be a juridical entity separate and apart from Defendant Argentina, then the Aquarius/SAC–D Satellite cannot be subject to execution for a judgment against Defendant Argentina. (*See* Appl. Mem. P. & A. 9:12–11:28; United States' Statement 4:13–16 ("If the court determines that CONAE is an 'agency or instrumentality' of Argentina, then CONAE's property would

be treated as distinct from that of Argentina, and would not be able to be used to satisfy [Plaintiff]'s judgment against [Defendant Argentina].").)

Here, Defendants make no argument before the Court that CONAE is not a juridical entity distinct from Defendant Argentina. (*See generally* Argentina's Opp'n; Spaceport's Opp'n.) Accordingly, the Court assumes Plaintiff's proposition is correct, that "CONAE *is* Argentina." (Appl. Mem. P. & A. 9:13–14.) The Court, however, declines to rule expressly that Plaintiff has overcome "the presumption of independent and separate legal status" afforded to entities like CONAE in the Ninth Circuit. *See Flatow*, 308 F.3d at 1070.

### 2. Plaintiff Fails to Meet Its Burden to Establish that an Exception to Sovereign Immunity Applies.

#### a. The Foreign State Immunities Act

■ "Sovereign immunity is a doctrine of international law under which domestic courts, in appropriate cases, relinquish jurisdiction over a foreign state." H.R.Rep. No. 94–1487 (1976), at 8, *reprinted in* 1976 U.S.C.C.A.N. 6604, 6606. Prior to the enactment of the FSIA, "a foreign state in our courts enjoy[ed] absolute immunity." *Id.*; *see also Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 486, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) ("For more than a century and a half, the United States generally granted foreign sover-

---

4. The FSIA provides no guidance on "whether the proper entity of a foreign state has been sued[ ]or whether an entity sued is liable in whole or in part of the claimed wrong." H.R. Rep. 94–1487, at 12 (1976), *reprinted in* 1976 U.S.C.C.A.N. at 6610. This is because "[t]he language and history of the FSIA clearly establish that the Act was not intended to affect the substantive law determining the liability of a foreign state or instrumentality. . . ." *First Nat'l City Bank v. Banco Para El Comercio*

*Exterior de Cuba (Bancec)*, 462 U.S. 611, 620, 103 S.Ct. 2591, 77 L.Ed.2d 46 (1983). To resolve issues of liability, courts turn to the Supreme Court's decision in *Bancec* and its progeny. *See Flatow*, 308 F.3d at 1069 ("Questions of liability are addressed by *Bancec*, which examines the circumstances under which a foreign entity can be held substantively liable for the foreign government's judgment debt.").

eigns complete immunity from suit in the courts of this country."). In 1976, Congress passed the FSIA, "a comprehensive statute containing a 'set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies, or instrumentalities.' " *Republic of Austria v. Altmann,* 541 U.S. 677, 691, 124 S.Ct. 2240, 159 L.Ed.2d 1 (2004). The FSIA codified a "restrictive principle" that "recognized immunity for public acts, that is to say, acts of a governmental nature typically performed by a foreign state, but not for acts of a private nature even though undertaken by a foreign state." *Cassirer v. Kingdom of Spain,* 616 F.3d 1019, 1026 (9th Cir.2010).

■■■ The FSIA "contains two primary forms of immunity." *Rubin v. Islamic Republic of Iran,* 637 F.3d 783, 793 (7th Cir.2011) (examining both jurisdictional and execution immunity). Pursuant to 28 U.S.C. § 1604, a foreign state is generally granted jurisdictional immunity from suit. *See* 28 U.S.C. § 1604 ("[A] foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in [the FSIA]."). The other primary form of immunity is codified under 28 U.S.C. § 1609 ("§ 1609"), which provides that "the property in the United States of a foreign state shall be immune from attachment[,] arrest and execution." 28 U.S.C. § 1609. The FSIA, however, "carves out certain exceptions to its general grant of immunity." *Altmann,* 541 U.S. at 691, 124 S.Ct. 2240. "Unless a specified exception to foreign sovereign immunity applies, [a] court lacks jurisdiction." *Peterson v. Islamic Republic of Iran,* 627 F.3d 1117, 1122 (9th Cir. 2010). Thus, the FSIA provides "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.,*

488 U.S. 428, 434, 109 S.Ct. 683, 102 L.Ed.2d 818 (1989). In that same vein, the FSIA provides the sole basis for attaching a foreign state's property in the United States. *See Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect,* 89 F.3d 650, 656 (9th Cir.1996) ("Under § 1609 of the FSIA, a foreign state's property 'shall be immune from attachment, arrest, and execution' except in certain enumerated circumstances. . . ."); *Rubin,* 637 F.3d at 794.

Although §§ 1609 and 1610 state that immunity from attachment or execution generally exists for foreign states aside from certain exceptions, "[t]hey are silent as to who has the burden of pleading and proving immunity from execution." *Peterson,* 627 F.3d at 1124. Recently, in *Peterson,* the Ninth Circuit cleared that cloud of doubt. *See id.* at 1127–28. The Court of Appeals adopted a "burden-shifting approach" that "[r]equir[es] the plaintiff to prove that immunity does not exist, rather than [one that] plac[es] the burden on the defendant foreign state." *Id.* ("holding that the burden-shifting approach to foreign sovereign immunity from suit also applies to immunity from execution"). Under the burden-shifting approach, there is a statutory presumption of immunity from attachment or execution "if it is apparent from the pleadings or uncontested that the defendant is a foreign state." *Id.* at 1125. "Once the court has determined that the defendant is a foreign state, 'the burden of production shifts to the plaintiff to offer evidence that an exception applies.' " *Id.* "If the plaintiff satisfies [its] burden of production," then "the defendant [must] demonstrate[ ]by a preponderance of the evidence that the claimed exception does not apply." *Id.* In applying the burden-shifting framework, a district court must heed the Ninth Circuit's instruction that "the exceptions to immunity from execution are more narrow than the exceptions

from immunity from suit." *Id.* at 1128. This is because "Congress fully intended to create rights without remedies, aware that plaintiffs would often have to rely on foreign states to voluntarily comply with U.S. court judgments." *Id.* Therefore, "courts [must] proceed carefully in enforcement actions against foreign states." *Id.*

b. *The Aquarius/SAC–D Satellite Is Not Being Used in the United States.*

■ It is apparent from the pleading, and the parties are also in unanimity, that Defendant Argentina is a foreign state. (*See* Compl. ¶ 4; Argentina's Opp'n 9:16–14:18.) Therefore, a statutory presumption of immunity exists, and the burden of production shifts to Plaintiff to offer evidence that an enumerated exception under § 1610(a) applies. *See Peterson,* 627 F.3d at 1125. Plaintiff cannot meet its burden because Plaintiff fails to show that the Aquarius/SAC–D Satellite is being "used for" commercial activity in the United States.

In *Af–Cap, Inc. v. Chevron Overseas (Congo) Ltd.,* 475 F.3d 1080, 1087 (9th Cir.2007), the Ninth Circuit defined the precise meaning of "used for" in § 1610(a). The Court of Appeals adopted a narrow construction and held that a property is "used for commercial activity" "when the property in question is put into action, put into service, availed or employed *for* a commercial activity, not *in connection* with a commercial activity or *in relation* to a commercial activity." *Id.* at 1087, 1091 ("We are also mindful that we must construe the waiver provisions in the FSIA narrowly."). Moreover, the property must be in "active employment for commercial purposes" at the time the writ of attachment or execution is sought. *See id.* at 1088 (determining that a property may not be executed upon if it "merely [has] a passive, passing, or past connection to

commerce"); *Aurelius Capital Partners, LP v. Republic of Argentina,* 584 F.3d 120, 130 (2d Cir.2009) ("[T]he property that is subject to attachment and execution ... must have been 'used for a commercial activity' *at the time* the writ of attachment or execution is issued."). The appellate court determined that its narrow construction of "used for" was well supported by both the legislative history and statutory structure of the FSIA. *See Af–Cap, Inc.,* 475 F.3d at 1088–89; *see also* H.R.Rep. No. 94–1487, at 28, 1976 U.S.C.C.A.N. at 6627 ("The property in question must be used for a commercial activity in the United States."); *De Letelier v. Republic of Chile,* 748 F.2d 790, 798–99 (2d Cir.1984) ("The FSIA distinguishes between execution against property of an agency or instrumentality of a foreign state, which may be executed against regardless of whether the property was used for the activity on which the claim is based under § 1610(b)(2), and the property of the foreign state itself, which may be executed against only when the property was used for the commercial activity on which the claim is based under § 1610(a)(2). In so distinguishing, Congress sharply restricted immunity from execution against agencies and instrumentalities, but was more cautious when lifting immunity from execution against property owned by the State itself."). The Ninth Circuit also found that "a pivotal purpose of the FSIA[ ][is] to limit execution against property directly belonging to a foreign state." *Af–Cap, Inc.,* 475 F.3d at 1089.

Plaintiff cannot meet the narrow construction adopted by the Ninth Circuit. In asserting that the Satellite is being "used for" commercial activities, Plaintiff proposes several commercial activities. The only commercial activity stated in Plaintiff's Complaint, if it can be described as such, is the "measur[ing] [of] ocean salinity, evapo-

ration, precipitation, and other elements of the water cycle." (Compl. ¶ 20.) In its Application, Plaintiff describes the commercial activity to be "build[ing] satellites and launch[ing] them into space for purposes including telecommunications, navigation and meteorology." (Appl. Mem. P. & A. 14:6–7.) Plaintiff also alleges that "climate and space research" are commercial activities. (Id. at 14:11–12.) Even assuming that these are "commercial activities," Plaintiff fails to persuade the Court that the Aquarius/SAC–D Satellite is exempt from immunity. The Aquarius/SAC–D Satellite is neither being put into service nor actively being employed for these activities, most of which will occur only after the Satellite is "once launched." Compare Af–Cap, Inc., 475 F.3d at 1091 with (Compl. ¶ 20.); see also Aurelius Capital Partners, LP, 584 F.3d at 130. Currently, the Satellite is not measuring the water cycle on earth or collecting climate and space research. It is not being launched into space. Lastly, Plaintiff has not pointed to any evidence showing that the Satellite is being built, assuming that the construction of a satellite could be construed as a commercial activity. See NML Capital, Ltd. v. Republic of Argentina, No. 03–CIV–8845, 2011 WL 1533072, at *6 (S.D.N.Y. Apr. 22, 2011) ("The Navigational Controls [of a satellite] at the time of attachment and now are being constructed . . . and are not being used for commercial activity."). In fact, Plaintiff's evidence shows that the property it seeks to execute has already been "built." (See Volkert Decl. ¶ 8 ("SAC–D bus owned by the Argentine space agency CONAE and built for CONAE by the Argentine corporation INVAP.").)

Sensing that its argument was lacking, Plaintiff re-characterizes the property to be attached as a "spacecraft bus" instead of the entire Aquarius/SAC–D Satellite. (Reply to Argentina's Opp'n 2:15 ("Argen-tina's main contribution to the SAC–D satellite is the bus.").) Plaintiff also redefines the commercial activity at issue as the "transmit[ting] [of] diagnostic information concerning the satellite to ground control both during and prior to launch." (Id. at 5:9–11.) Plaintiff's last-ditch attempts are of no avail.

First, in Colella v. Republic of Argentina, No. C07–80084, 2007 WL 1545204, at *5–*7 (N.D.Cal. May 29, 2007), the district court for the Northern District of California rejected arguments similar to Plaintiff's when the court applied the Ninth Circuit's narrow construction of § 1610(a). The Court finds Colella analogous and germane to the case at bar. In Colella, the plaintiffs sought an execution of Argentina's property to satisfy a judgment obtained against Argentina, who had defaulted on the plaintiffs' bonds in December 2001. Id. at *1. The plaintiffs applied for a writ of execution on a Boeing 757 airplane owned by Argentina to transport its president. Id. The airplane had been flown into the United States for service and maintenance. Id. at *5. The court held that the airplane was immune from execution because it was not being "used for" commercial activity in the United States. Id. The "plane need[ed] to be maintained and serviced, but it [was] not 'used for' maintenance and service." Id. at *6. Thus, the plane only had a "passing connection" to commerce and could not qualify under § 1610(a). Id.

██ Here, similar to Colella, 2007 WL 1545204, at *1, Plaintiff is pursuing an execution on the Aquarius/SAC–D Satellite because Defendant Argentina defaulted on bonds owned by Plaintiff in December 2001. (Second Supplemental Decl. of Bruce E. Van Dalsem ("Van Dalsem Second Decl.") ¶ 3.) The Aquarius/SAC–D Satellite is being tested and prepared for

launch. (Ianson Decl. ¶ 19.) The Satellite, however, is not an instrument to test or to prepare a launch. This difference "is not a mere syntactical infelicity that ... [the Court is permitted] to look beyond." *See Af–Cap, Inc.*, 475 F.3d at 1087. "The 'used for a commercial purpose' exception of Section 1610(a) is to be strictly construed." *Colella*, 2007 WL 1545204, at *5. As with the service and maintenance of the plane in *Colella*, the tests and preparation of the Aquarius/SAC–D Satellite for its intended commercial activity in space constitute a passing connection to commerce. *Id.* at *6.

Second, Plaintiff's proffered evidence shows that the satellite bus and the instruments, by definition, are for use in space. In its Reply, Plaintiff cites to the "L2B Aquarius/SAC–D Satellite Mission System Requirements Document" and argues that the Satellite requires "[t]he T–0 umbilical interface between the Observatory and the launch support complex [to] provide housekeeping telemetry such that Observatory launch readiness can be verified remotely through liftoff." (Reply to Argentina's Opp'n 5:3–7.) Plaintiff alleges that, because the satellite bus is a component of the "Observatory," the bus is being used to transmit information prior to launch. (*See id.* at 5:9–11.) The evidence supports a contrary conclusion. It is of import that Plaintiff chooses not to expressly define "Observatory" in its Reply. (*Id.* at 5:8–9.) Plaintiff's evidence states, "The Observatory denotes the entire flight system *placed in orbit by the launch vehicle* and consists of the Service Platform, the Aquarius and SAC–D instrument suit." (Volkert Decl. Ex. C (emphasis added).) By definition then, the Observatory, including the satellite bus, is not used or does not function until it is placed in orbit. Moreover, the specification cited by Plaintiff seems to require the "T–0 umbilical interface" to verify the "Observatory launch readiness."

(*See id.*) The T–0 umbilical interface is being used to determine launch readiness, not the satellite bus. As aforementioned, these pre-launch tests of the Aquarius/SAC–D Satellite constitute a passing connection to commerce. Plaintiff fails to provide any other evidentiary support, and so, does not meet its burden of production. *See Peterson*, 627 F.3d at 1125; *see also Indep. Towers of Wash. v. Wash.*, 350 F.3d 925, 929 (9th Cir.2003) ("[J]udges are not like pigs, hunting for truffles buried in briefs.").

Accordingly, Plaintiff does not establish the probable validity of its claim; it fails to show that the Aquarius/SAC–D Satellite is being "used for" commercial activity in the United States.

c. *The Aquarius/SAC–D Satellite Will Not Be Used for a Commercial Activity.*

 Plaintiff also cannot establish the probable validity of its claim because the act of cooperating with nation-states to advance human understanding of the earth's ocean salinity is not a "commercial activity." Under the FSIA, "commercial activity" is defined as "a regular course of commercial conduct or a particular commercial transaction or act." 28 U.S.C. § 1603(d). The Act makes clear that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." *Id.* "This definition, however, leaves the critical term 'commercial' largely undefined." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612, 112 S.Ct. 2160, 119 L.Ed.2d 394 (1992); *see also Saudi Arabia v. Nelson*, 507 U.S. 349, 358, 113 S.Ct. 1471, 123 L.Ed.2d 47 (1993) ("[T]he Act is too obtuse to be of much help in reaching [a conclusion on whether a conduct qualifies as a

commercial activity].") (quotations omitted). In the FSIA's legislative history, however, Congress did provide specific examples of "commercial activity," including "the sale of a service or a product, [the] leasing of property, [the] borrowing of money, [the] employment or engagement of laborers, clerical staff or public relations or marketing agents, [and the] investment in a security of an American corporation." H.R.Rep. No. 94–1487, at 16, 1976 U.S.C.C.A.N. at 6615. Likewise, Congress stated that the "buy[ing] provisions or equipment for ... armed forces or [the] construct[ing][of] a government building" would constitute a commercial activity. *Id.* The legislative history also gives examples of non-commercial activities, such as the "participation in a foreign assistance program" and "the employment of diplomatic, civil service, or military personnel." *Id.*

Due to "congressional diffidence," the Supreme Court has attempted to give more meaning to "commercial activity." *See Nelson,* 507 U.S. at 359, 113 S.Ct. 1471. The high court has held that "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Weltover, Inc.,* 504 U.S. at 614, 112 S.Ct. 2160. The Supreme Court has instructed lower courts that "the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives." *Id.* Courts are to analyze "whether the particular actions that the foreign state performs (whatever the motive behind them) are the type of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* "Thus, a foreign government's issuance of regulations limiting foreign currency exchange is a sovereign activity, because such ... control of commerce cannot be exercised by a private party; whereas a contract to buy army boots or even bullets is a 'commercial' activity, because private companies can similarly ... acquire goods...." *Id.*

■ The Court "begin[s][its] analysis by identifying the particular conduct on which the [Plaintiff's] action is 'based' for purposes of the Act." *Nelson,* 507 U.S. at 356, 113 S.Ct. 1471; *see also Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria,* 647 F.2d 300, 308 (2d Cir.1981) ("[O]ur first task is to identify what particular conduct in this case is relevant."), *overruled on other grounds, Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic,* 582 F.3d 393 (2d Cir.2009). Plaintiff confuses the analysis by asking the Court to consider how the Satellite was built. In its Reply, Plaintiff explains that "the SAC–D bus was not even made by CONAE[,] it was largely built by an Argentine corporation called INVAP." (Reply to Argentina's Opp'n 2:27–28.) Plaintiff alleges that "[n]umerous private companies manufacture and sell satellite buses to private companies." (*Id.* at 2:20–21.) The Ninth Circuit, however, has already held "how [a] property was generated is. irrelevant" to determining whether that property is being used for a commercial activity. *Af–Cap, Inc.,* 475 F.3d at 1095; *see also Walker Int'l Holdings Ltd. v. Republic of Congo,* 395 F.3d 229, 235 (5th Cir.2004) ("[T]he fact that the property was generated by commercial activity, namely, oil exploration, is irrelevant."). Thus, whether Defendant Argentina is manufacturing or selling the satellite bus outside the United States is not an apropos question. The relevant conduct to this action is Defendant Argentina's participation in a joint program with other nation-states to conduct a scientific and humanitarian mission, whereby data on the earth's ocean will be collected from space

and will be disseminated for free to the scientific community. (*See* Compl. ¶ 20; Ianson Decl. ¶ 5.) The conduct encompasses both pre-launch activities, like testing and preparation, and post-launch activities, mainly the gathering of information from space.

Having defined the conduct that is relevant to the case at hand, the Court finds that Defendant Argentina's relationship to NASA and the other participating nation-states is not "commercial," and therefore, the Satellite is not an exempt property under § 1610(a). In *EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 482 (2d Cir. 2007), the Second Circuit affirmed a district court's order vacating orders of attachment on accounts at the Federal Reserve Bank owned by Argentina's central bank. The plaintiff in *EM Ltd.* had argued that the funds could be attached because they were to be used for the payment of debt owed to the International Monetary Fund ("IMF"). *Id.* at 481. According to the plaintiff, the payment of debt to the IMF was a commercial activity under Supreme Court precedent. *Id.* at 481–82. The Second Circuit disagreed and held that Argentina's relationship with the IMF and its obligations based on that relationship were not "commercial." *Id.* at 482. "Only sovereign nation states [could] become members of the IMF … and only members can avail themselves of IMF financing…." *Id.* at 482–83. Therefore, Argentina was exercising "powers peculiar to sovereigns," not those of a private party. *See id.* at 482.

Here, as in *EM Ltd.*, 473 F.3d at 482–83, Defendant Argentina's relationship to the space agencies of the United States, France, Italy, and Canada cannot be defined as commercial. The Satellite will be used on a mission of "international cooperation" exclusively amongst governmental bodies. (Van Dalsem Decl. Ex. O at 2.) Thus, a private party simply cannot be a part of the intergovernmental relationship established around the Aquarius/SAC–D Satellite. Moreover, NASA and CONAE entered into a memorandum of understanding; the obligations contained in the MOU are enforced through diplomatic means, not commercial. (*See* Ianson Decl. Ex. B.) Defendant Argentina is exercising its "powers peculiar to sovereign" while participating in the mission to collect data on the earth's ocean salinity with other governmental bodies. *See EM Ltd.*, 473 F.3d at 482–83; *see also* H.R.Rep. No. 94–1487, at 16, 1976 U.S.C.C.A.N. at 6615 ("participation in a foreign assistance program"). Plaintiff has made no genuine effort to rebut this argument raised by both Defendant Argentina and the United States. In fact, it seemingly agrees that the collaboration is sovereign in nature. (*See* Reply to United States' Statement 2:1–9.)

Accordingly, Plaintiff's claim is probably invalid. The Aquarius/SAC–D Satellite is not being used for "commercial activity," and therefore, not subject to execution by Plaintiff.[5] The burden of production is

---

5. The Aquarius/SAC–D Satellite may not be subject to execution also because "[t]he alleged conduct itself—giving away [information]—is not a commercial activity." *In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 92 (2d Cir.2008), *abrogated on other grounds by Samantar v. Yousuf*, — U.S. —, 130 S.Ct. 2278, 2286, 176 L.Ed.2d 1047 (2010). The Second Circuit Court of Appeals in *In re Terrorist Attacks on September 11,*

*2001,* held that the supervising and making of donations to charities that fund terrorist organizations were not commercial activities. *See id.* The appellate court acknowledged that private citizens could also donate and oversee charitable donations. *Id.* Nevertheless, the Second Circuit determined that those actions were not the *"type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* The donations to charity

squarely on Plaintiff to rebut the statutory presumption of immunity. *See Peterson,* 627 F.3d at 1125. Plaintiff does not carry its burden. Because Plaintiff cannot establish the probable validity of its claim, the Court DENIES Plaintiff's Application for a TRO.

### C. *Plaintiff Has Not Shown that an "Extraordinary Remedy" Is Warranted.*

■■■ Plaintiff requests the Court to issue a TRO, prohibiting all Defendants from transferring, moving, or launching the Aquarius/SAC–D Satellite. (Appl. 2:16–23.) The Court declines to do so. Plaintiff has not carried its burden of showing such an "extraordinary remedy" is warranted. *See Winter,* 129 S.Ct. at 376.

### 1. *Plaintiff Is Unable to Establish Its Likelihood of Success on the Merits or the Existence of Serious Questions on the Merits.*

■■■ A plaintiff seeking a TRO must establish that it is likely to succeed on the merits. *See Winter,* 129 S.Ct. at 374. In the Ninth Circuit, a plaintiff may also prove a TRO is warranted by raising "serious questions going to the merits." *Cottrell,* 632 F.3d at 1132. Plaintiff can do neither. As aforementioned, Plaintiff does not demonstrate that it is more likely than not to prevail on its creditor's claim. *See supra* Part II.B. Because Plaintiff is unable to meet the probable validity element for a TPO, it similarly cannot meet the likelihood of success element for a TRO. (Appl. Mem. P. & A. 9:5 ("This is essentially the same as showing a likelihood of success on the merits.").) To preserve scarce judicial resources and to give respect to the urgency of the circumstances, the Court declines to restate its prior analysis. Plaintiff has the burden of producing evidence that proves an exception to sovereign immunity applies to the Aquarius/SAC–D Satellite. *Peterson,* 627 F.3d at 1125. Plaintiff fails to prove that the Satellite is being "used for commercial activity in the United States." *See* 28 U.S.C. § 1610(a).

### 2. *An Injunction Is Not in the Public Interest.*

■■■ A TRO is also inappropriate because it is not in the public interest. The Ninth Circuit has mandated that, "[i]n cases where the public interest is involved, the district court must also examine whether the public interest favors the plaintiff." *Fund for Animals v. Lujan,* 962 F.2d 1391, 1400 (9th Cir.1992); *see also Weinberger v. Romero–Barcelo,* 456 U.S. 305, 312, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982) ("In exercising their sound dis-

were "not part of the trade and commerce engaged in by a 'merchant in the marketplace.' " *Id.; see also Kato v. Ishihara,* 360 F.3d 106, 112 (2d Cir.2004) ("Although a private Japanese business might engage in these activities on its own behalf ... such a business would not typically undertake the promotion of other Japanese businesses, or the promotion of Japanese business interests in general.").

Here, Defendant Argentina, NASA, and other nation-states' collection of data on ocean salinity and dissemination of said data for free are not actions by which a private party engages. Although Plaintiff may be correct, in that private companies employ satellite buses and operate remote sensing satellites, that fact in and of itself is not dispositive for the case at hand. (*See* Appl. Mem. P. & A. 14:5–15; Reply to Argentina's Opp'n 3:1–4:21.) It also matters whether the collection of and distribution of oceanographic data at no cost are "part of the trade and commerce engaged in by a 'merchant in the marketplace.' " *See In re Terrorist Attacks on Sept. 11, 2001,* 538 F.3d at 92. They are not. In addition, a private party would not be gathering data and distributing it to promote the interests of all of humanity. *See Kato,* 360 F.3d at 112.

cretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). The public interest is involved when "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences." *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1139 (9th Cir.2009). "In considering the public interest, [the Court] may [also] consider the hardship to all individuals ... [and is] not limited to parties...." *Golden Gate Rest. Ass'n v. City of San Francisco,* 512 F.3d 1112, 1126 (9th Cir.2008). Further, "[t]he public interest analysis for the issuance of a preliminary injunction requires [the Court] to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" *Cal. Pharmacists Ass'n v. Maxwell–Jolly,* 596 F.3d 1098, 1114–15 (9th Cir.2010). It is an abuse of discretion for a court to enter a permanent injunction without consideration of the public interest. *See Winter,* 129 S.Ct. at 381; *Stormans, Inc.,* 586 F.3d at 1140 ("The district court clearly erred by failing to consider the public interest at stake."). A plaintiff bears the initial burden of showing that the injunction is in the public interest. *See Winter,* 129 S.Ct. at 374.

There are countless reasons why the issuance of a TRO would be against the public interest. First, a TRO would adversely affect other parties involved in the Aquarius/SAC–D Satellite mission. Were the Court to grant Plaintiff's request to prevent the launch of the Satellite for at least 40 days, NASA would have to delay the launch until February 2012. This is because NASA can only support a launch up to July 15, 2011. (Ianson Decl. ¶ 20.) The delay could jeopardize the $250,000,000 that NASA has expended for the mission. (*See id.* ¶ 16.) Preventing the Satellite from launching until February 2012 will also cost an additional $30,000,000 to $40,000,000. (*See id.* ¶ 22.) The amount of damage that will be inflicted upon the United States' national aerospace program is breathtakingly staggering. Second, the public interest in enforcing judgments must be balanced against other public interests, such as: (1) the advancement of the general welfare and security of the nation through aeronautical and space activities; (2) the expansion of human knowledge of the earth; and (3) promoting cooperation between the United States and other nations in the peaceful exploration of "[s]pace: the final frontier." (*See* Van Dalsem Decl. Ex. M.) The public interest in enforcing judgments does not outweigh these other public interests for the instant action. *Cottrell,* 632 F.3d at 1138 ("We will not grant a preliminary injunction, however, unless [the] public interest[ ][for a TRO] outweigh other public interests that cut in favor of *not* issuing the injunction."). Third, issuing a TRO will impair the relationship between the United States and its foreign partners on space exploration and other scientific collaborative projects. Enjoining the launch of the Aquarius/SAC–D Satellite at this late stage, after national space agencies from France, Italy, Canada, and Argentina have contributed much resources and time, will undoubtedly frustrate current and future joint programs. (Brown Decl. Ex. A at 6; Ianson Decl. ¶ 13.) This unnecessary and dangerous interference with foreign affairs is precisely the reason why Congress and the Supreme Court adopted a "restrictive theory" on the execution of foreign property in the United States. Accordingly, Plaintiff's request for a temporary restraining order is DENIED. Plaintiff does not establish that it is likely to succeed on the merits of its claim and is unable to show that an injunction is in the public interest.

In sum, Defendant Argentina should honor its lawful debts. Defendant Argen-

tina's decision to not pay just debt, however, does not grant the Court authority to ignore the statutory language of the FSIA and Congressional intent. Nor can it circumvent Ninth Circuit precedent construing the language of § 1610(a) narrowly and placing the burden of production upon Plaintiff to show that the Aquarius/SAC–D Satellite is exempt from sovereign immunity. Until Congress or the Court of Appeals deems otherwise, Plaintiff may only attach and execute upon Defendant Argentina's property that is being used for a commercial activity in the United States. The Aquarius/SAC–D Satellite does not meet that restrictive and narrow definition.

III. *CONCLUSION*

For the foregoing reasons, Plaintiff's Application for a Temporary Protective Order, Temporary Retraining Order, and Order to Show Cause is **DENIED.**

IT IS SO ORDERED.